# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

LIN, ET. AL,                  )

                               )

               Plaintiffs,     )         Civil Action No. 06-1825 (RMC)

                               )

         vs.                    )

                               )

UNITED STATES OF AMERICA,   )

                               )

               Defendant.    )

_____)

### Defendant's Motion to Dismiss

Defendant United States of America, by and through its undersigned counsel, hereby

moves this Court to dismiss this action with prejudice pursuant to Fed. R. Civ. P. 12(b)(1) or, in

the alternative, 12(b)(6) for the reasons set forth in the accompanying Memorandum.


Dated: January 12, 2006          Respectfully submitted,
                               PETER D. KEISLER
                               Assistant Attorney General

                               JEFFREY A. TAYLOR
                               United States Attorney for the District of Columbia

                               VINCENT M. GARVEY
                               Deputy Director, Federal Programs Branch

Of Counsel                       _/s/_____
James G. Hergen (D.C. Bar #116382)     ADAM D. KIRSCHNER
Assistant Legal Adviser for             Trial Attorney
East and South Asian Affairs          U.S. Department of Justice
Office of the Legal Adviser           Civil Division, Federal Programs Branch
U.S. Department of State             Mailing Address
Washington, D.C. 20520            P.O. Box 883
                                     Washington, D.C., 20044
                                     Delivery Address
                                     20 Massachusetts Ave., NW., Room 7126

Washington, DC 20001
Telephone: (202) 353-9265
Fax: (202) 616-8470
Adam.Kirschner@usdoj.gov

COUNSEL FOR DEFENDANT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LIN, ET. AL, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 06-1825 (RMC) |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### <u>Memorandum in Support of Defendant's Motion to Dismiss</u>

Plaintiffs in this action seek to have this Court intrude into an area reserved to the political branches.  Specifically, plaintiffs ask this Court to determine, contrary to the determination by the political branches, that the United States exercises sovereignty over Taiwan and, thereby, to determine what rights, <u>if any</u>, plaintiffs may have under United States law as a result of such a determination.

Plaintiffs' lawsuit suffers from a number of defects that require dismissal.  The political and advisory nature of this case creates several fatal jurisdictional defects.  First, the determination of who exercises sovereignty over a particular territory is a quintessential non-justiciable political question.  When the political branches have spoken on the matter, as they have in this case with a series of official executive directives and pronouncements and the Taiwan Relations Act of 1979, there is even more reason to defer to those political branches.  Second, plaintiffs lack standing because their purported injury of being in an alleged "legal limbo" is nothing more than a generalized grievance that is not caused by any unlawful action by the United States nor would the requested relief redress such a vague injury.  Third, none of the

statutes cited by plaintiffs waive the United States' sovereign immunity or otherwise grant this

Court jurisdiction over plaintiffs' claims.

Moreover, even if plaintiffs' claims were justiciable, they would have failed to state a

claim upon which relief could be granted.  Plaintiffs base their entire cause of action on an order

issued by General Douglas MacArthur, who was the Supreme Commander for the Allied Powers

in the Pacific at the end of World War II.  However, that order did not create a private right of

action.  Accordingly, the United States respectfully requests this Court to grant its motion to

dismiss this complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil

Procedure.

## BACKGROUND

This action is brought by ten individuals and the Taiwan Nation Party, "acting on behalf

of approximately 1,000 of its other members."  <u>See</u> Complaint ("Compl.") at ¶ 14.  Plaintiffs

state that the "[d]eclaratory [j]udgment sought in this action relates to the purposes for which the

Taiwan Nation Party was founded."  <u>Id</u>.  Plaintiffs base their complaint on an order issued by

General Douglas MacArthur, Supreme Commander for the Allied Powers in the Pacific, on

September 2, 1945, that spelled out the manner in which the Japanese were to surrender to the

allied forces.  <u>See id</u>. at ¶ 1 (arguing that the General Order created a "trust on behalf of the

Allied Powers [that] remains in effect today").  Under the terms of the order issued by General

MacArthur, the "Imperial General Headquarters by direction of the Emperor, and pursuant to the

surrender to the Supreme Commander for the Allied Powers of all Japanese armed forces by the

Emperor, hereby orders all of its commanders in Japan and abroad to cause the Japanese armed

forces and Japanese-controlled forces under their command to cease hostilities at once, to lay

down their arms, to remain in their present locations and to surrender unconditionally." <u>See</u> Text of Japanese Order, Congressional Record, Vol. 91, Part 6, September, 1945, at 8348 ("Japanese Order") (attached as Exhibit 1). In the same document, the Imperial General Headquarters of Japan ordered its senior commanders within Formosa ("Taiwan"), and in other areas, to "surrender to Generalissimo Chiang Kai-shek." <u>Id</u>. at (1)(a).

Plaintiffs allege that because of this surrender order, "[f]rom 1945 to the present, Taiwan has been an occupied territory of the United States . . . and [n]either the Treaty of San Francisco nor the Taiwan Relations Act nor any other legal instrument terminated the agency relationship between the United States and the [Republic of China ("ROC")] for the purpose of the occupation and administration of Taiwan." <u>See</u> Compl. at ¶¶ 46, 47. According to the plaintiffs, the United States was "the principal occupying Power" and MacArthur's Order "empower[ed] the government of the ROC to accept the surrender of the Japanese troops in Taiwan." <u>Id</u>. Plaintiffs assert that the United States "is still holding sovereignty over Taiwan." <u>Id</u>. at ¶ 49. In addition to asking this Court to determine that the United States does indeed hold sovereignty over Taiwan, plaintiffs are also seeking to have this Court advise them of "what fundamental rights, if any, they may have under United States laws" because they allegedly "suffer as a result of the legal limbo in which they find themselves." <u>Id</u>. at ¶ 3.[1]

---

[1]For the Court's information, a history of the United States relations with Taiwan is available at the U.S. Department of State's Country Page on China, http://www.state.gov/p/eap/ci/ch/.

## ARGUMENT

### I.    THIS COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER THIS ACTION

For a lower federal court to have subject matter jurisdiction, the action must present a case or controversy pursuant to Article III, §2, of the United State Constitution and there must be a statutory basis for the jurisdiction.  See Insurance Corp. of Ireland, LTD. v. Compagnie des Bauxites de Guniee, 456 US 694, 701-2 (1982) ("[f]ederal courts are courts of limited jurisdiction.  The character of the controversies over which federal judicial authority may extend are delineated in Article III, § 2, cl. 1.  Jurisdiction of the lower federal courts is further limited to those subjects encompassed within a statutory grant of jurisdiction.  Again, this reflects the constitutional source of federal juridical power: Apart from [the Supreme Court] that power only exists 'in such inferior Courts as the Congress may from time to time ordain and establish.' Art. III, § 1.").

This action does not present a case or controversy that arises under Article III, § 2 because plaintiffs lack standing and their cause of action presents a non-justiciable political question.  See Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 215 (1974) (the "[Supreme] Court noted that the concept of justiciability, which expresses jurisdictional limitations imposed upon federal courts by the 'case or controversy' requirement of Art. III, embodies both the standing and political question doctrines") (citing Flast v. Cohen, 392 U.S. 83, 88 (1968); see also Hwang Geum Joo v. Japan, 413 F.3d 45, 47-48 (D.C. Cir. 2005).  It is only necessary for one jurisdictional defect to exist to deprive a court of jurisdiction.  See Schlesinger, 418 U.S. at 215 ("either the absence of standing or the presence of a political question suffices to prevent the power of the federal judiciary from being invoked by the

complaining party") (citations omitted).  Both are present in this case.[2]  Furthermore, the subject

matter of this action is not encompassed by a statutory grant of jurisdiction; plaintiffs cite two

statutes as a basis for jurisdiction but they are both not applicable in this case.  See Compl. at ¶

16 (citing "28 U.S.C. Sections 1331 and 1346(a)(2)").  Due to these independent constitutional

and statutory deficiencies, any one of which would be sufficient, this Court lacks subject matter

jurisdiction over this action.

### A.      Plaintiffs Lack Standing to Bring this Action

Plaintiffs seek no more than an advisory opinion from this Court.  They are asking "this

Court to determine what fundamental rights, if any, they may have under United States laws."

See Compl. at ¶ 3 (emphasis added).  Plaintiffs are not even alleging that they are certainly

entitled to such rights but rather are asking this Court to advise them of what rights they "may"

have.  However, "[t]he Constitution (article 3, s 2) limits the exercise of judicial power to 'cases'

and 'controversies.'"  See Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 239

(1937).  This requirement includes actions, such as this one, in which the plaintiffs seek a

declaratory judgment.  See Golden v. Zwickler, 394 U.S. 103, 108 (1969) ("The federal courts

established pursuant to Article III of the Constitution do not render advisory opinions.  For

adjudication of constitutional issues, concrete legal issues, presented in actual cases, not

abstractions, are requisite.  This is as true of declaratory judgments as any other field.") (quoting

---

[2]There is "no fixed rule as to the order of analysis elements of justiciability."  See
American Jewish Congress v. Vance, 575 F.2d 939, 943 (D.C. Cir. 1978) (finding it "more
prudent to initially determine the issue of standing" because it only involves inquiry into Article
III limitations as opposed to also involving "an analysis of the separation of powers doctrine" for
determining whether the cause of action presents a non-justiciable political question).

United Public Workers of American (C.I.O.) v. Mitchell, 330 U.S. 75, 89 (1947) (quotation marks omitted).

The advisory nature of the relief plaintiffs seek is evidenced by their inability to establish standing. An essential "element of the case-or-controversy requirement" is that a complainant "must establish that they have standing to sue." See Raines v. Byrd, 521 U.S. 811, 818 (1997). "The party invoking federal jurisdiction bears the burden of establishing" the elements of standing. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (emphasis added). "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." See Allen v. Wright, 468 U.S. 747, 751 (1984). Instead of being able to establish standing, plaintiffs are asking this Court to issue an advisory opinion on whether they would be entitled to certain rights if the United States did indeed exercise sovereignty over Taiwan.

Plaintiffs seek to bring a claim in which there is no personal injury, in which any generalized injury is not fairly traceable to any alleged unlawful conduct on the part of the United States, and in which that generalized injury would not likely be redressed by the requested relief. First, the only injury that plaintiffs allege in their complaint is that "they continue to suffer as a result of the legal limbo in which they find themselves." See Compl. at ¶ 3. This injury is neither "concrete and particularized" nor "actual or imminent," but rather based on the conjecture that harm would result from being in such an alleged legal limbo. See Lujan, 504 U.S. at 560. The plaintiffs are not in any different position than the millions of others who live in Taiwan. Furthermore, plaintiffs have not alleged that any harm has resulted from being in such a purported legal limbo. Second, no where in the complaint do plaintiffs allege any

- 6 -

unlawful conduct by the United States; instead, they merely seek to "have this Court determine what fundamental rights, if any, they may have under United States laws." See Compl. at ¶ 3. Their complaint is therefore entirely speculative and hypothetical. Plaintiffs do not allege that the United States inflicted injury on them, and without showing a causal connection between some unlawful conduct of the United States and an alleged injury, plaintiffs do not have standing. Third, the only form of redressability that plaintiffs seek is a declaratory judgment that they are entitled to fundamental rights because they are allegedly "subject to the jurisdiction of the United States." See Compl., Relief Requested. However, it is unclear how a court would redress plaintiffs' alleged vague injury of being in a legal limbo; the declaration of such broad fundamental rights would not necessarily foreshadow how those rights would be applied. The application of such rights, assuming arguendo that plaintiffs do suffer an injury, would be a necessary determination because otherwise plaintiffs may remain in a legal limbo by not knowing the specifics of the rights to which they would be entitled. Accordingly, plaintiffs have failed to satisfy each of the necessary preconditions for Article III standing.

## B.  The Complaint Presents a Non-Justiciable Political Question

"The political question doctrine is one aspect of 'the concept of justiciability, which expresses the jurisdictional limitations imposed on the federal courts by the 'case or controversy' requirement' of the Article III of the Constitution." Bancoult v. McNamara, 445 F.3d 427, 432 (D.C. Cir. 2006) (quoting Schlesinger v. Reservists Committee to Stop the War, 418 U.S. at 215). The doctrine is "primarily a function of the separation of powers." Id. (quoting Baker v. Carr, 369 U.S. 186, 210 (1962)) (quotation marks omitted). It "excludes from judicial review those controversies which revolve around policy choices and value determinations

- 7 -

constitutionally committed for resolution to the halls of Congress or the confines of the

Executive Branch."   Id. (quoting Japan Whaling Ass'n v. Am Cetacean Soc'y, 478 U.S. 221,

230 (1986)) (quotation marks omitted).  The topics of national security and foreign relations are

"quintessential sources of political questions" and "'rarely proper subjects for judicial

intervention.'"  Id. (quoting Haig v. Agee, 453 U.S. 280, 292 (1981).  That is because "[t]he

conduct of the foreign relations of our governments is committed by the Constitution to the

executive and legislative - 'the political' - departments of the government, and the propriety of

what may be done in the exercise of this political power is not subject to judicial inquiry or

decision."  Oetjen v. Central Leather Co., 246 U.S. 297, 302 (1918); see also Bancoult v.

McNamara, 445 F.3d at 433 (same).  The Supreme Court has cautioned in Baker v. Carr that "it

is error to suppose that every case or controversy which touches foreign relations lies beyond

judicial cognizance."  369 U.S. at 211.  Nevertheless, the Court did instruct that "[n]ot only does

resolution of [questions touching foreign relations] frequently turn on standards that defy judicial

application, or involve the exercise of a discretion demonstrably committed to the executive or

legislature; but many such questions uniquely demand single-voiced statement of the

Government's views."  Id.[3]

---

[3]Baker v. Carr lists six different criteria a Court could use in determining whether a case presents a non-justiciable political question: "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."  369 U.S. at 217.  However, "[t]o find a political question, [a court] need only conclude that one factor is present, not all."  See Bancoult v. McNamara, 445

In each of the seven requests for relief, plaintiffs state that they are entitled to certain

Constitutional rights "by virtue of living in a territory subject to the jurisdiction of the United

States." <u>See</u> Compl., Relief Requested. However, that statement assumes that plaintiffs are

living a territory subject to the jurisdiction of the United States. The question of what rights, if

any, to which plaintiffs are entitled may be answered only if the Court were first to determine

that the United States does exercise sovereignty over Taiwan. <u>See</u> Compl. at ¶ 2. This initial

question, which is the primary one before the Court, is inherently political and is, therefore, non-

justiciable. <u>See</u> <u>Baker v. Carr</u>, 369 U.S. at 212 ("[w]hile recognition of foreign governments so

strongly defies judicial treatment that without executive recognition a foreign state has been

called 'a republic of whose existence we know nothing,' and the judiciary ordinarily follows the

executive as to which nation has sovereignty over disputed territory, <u>once sovereignty over an</u>

<u>area is politically determined</u> and declared, courts may examine the resulting status and decide

independently whether a statute applies to that area") (emphasis added) (footnotes omitted). It

has been long settled that the question of who has sovereignty over a territory "is not a judicial,

but a political, question." <u>See</u> <u>Jones v. United States</u>, 137 U.S. 202, 212 (1890) ("[w]ho is the

sovereign, *de jure* or *de facto*, of a territory, is not a judicial, but a political, question, the

determination of which by the legislative and executive of any government conclusively binds

the judges, as well as all other officers, citizens, and subjects of that government. This principle

has always been upheld by this court, and has been affirmed under a great variety of

circumstances.") (citing cases as far back as 1818) (emphasis in original); <u>see also</u> <u>People's</u>

---

F.3d at 432 (citation and quotation marks omitted).

Mojahedin Organization of Iran v. United States Department of State, 182 F.3d 17, 24 (D.C. Cir. 1999); Sevilla v. Elizalde, 112 F.2d 29, 33-35 (D.C. Cir. 1940).

The issue of how to classify Taiwan's status is a matter to which it is particularly important for the United States government to speak in a single voice and which is best left to the political branches. The Ninth Circuit, when faced with the question of whether Taiwan was bound by the Warsaw Convention by the People's Republic of China being a party to the Convention, found that it must look "to the statements and actions of the 'political departments' in order to answer whether, following recognition of China and derecognition of Taiwan, China's adherence to the Warsaw Convention binds Taiwan." Mingtai Fire & Marine Ins. Co. v. United Parcel Service, 177 F.3d 1142, 1145 (9th Cir. 1999). The Court determined that "whether China is the sovereign, *de jure* or *de facto* of the territory of Taiwan is a political question, and '[o]bjections to the underlying policy as well as objections to recognition are to be addressed to the political department and not to the court.'" Id. (quoting United States v. Pink, 315 U.S. 203, 229 (1942)) (emphasis in original). Ultimately, the Court "merely recognize[d] and defer[red] to the political departments' position that Taiwan is not bound by China's adherence to the Warsaw Convention," but cautioned that it did "not independently determine the status of Taiwan." Mingtai, 177 F.3d at 1147.

The political departments have made it clear that the status of Taiwan does not include Taiwan being "an occupied territory of the United States." See Compl. at ¶ 46. As a matter of law, the relationship between the United States and Taiwan derives solely and exclusively from Executive Order No. 13014 of August 15, 1996, 61 Fed. Reg. 42963, and the Taiwan Relations

Act, 22 U.S.C. 3301, et seq.  That intricate relationship does not involve the United States

exercising sovereignty over Taiwan.

On December 30, 1978, President Carter issued a memorandum maintaining that the

"United States has announced that on January 1, 1979, it is recognizing the government of the

People's Republic of China as the sole legal government of China and is terminating diplomatic

relations with the Republic of China."  44 Fed. Reg. 1075.  President Carter further stated that

the "[e]xisting <u>international</u> agreements and arrangements in force between the United States and

Taiwan shall continue in force."  <u>Id</u>. (emphasis added).   Besides continuing the international

agreements that the United States entered into with Taiwan prior to January 1, 1979, President

Carter's memorandum stated that "[a]s President of the United States, I have constitutional

responsibility for the conduct of the foreign relations of the nation."  44 Fed. Reg. 1075; <u>see</u> <u>also</u>

<u>Banco Nacional de Cuba v. Sabbatino</u>, 376 U.S. 398, 410 (1964) ("[p]olitical recognition [of a

government] is exclusively a function of the Executive").  In his memorandum, President Carter

also stressed that the "American people will maintain commercial, cultural, and other relations

with the people on Taiwan without official government representation and without diplomatic

relations."  44 Fed. Reg. 1075.  In an executive order in 1996, the executive further spelled out

the manner in which the United States is to maintain unofficial relations with the people of

Taiwan.  <u>See</u> Executive Order No. 13014 (August 15, 1996).  That executive order also specified

that the "[a]greements and arrangements referred to in paragraph (B) of President Carter's

memorandum of December 30, 1978, entitled 'Relations With the People on Taiwan' (44 FR

1075) shall, unless otherwise terminated or modified in accordance with law, continue in force."

<u>Id</u>.

Besides issuing executive orders and presidential memorandums concerning the status of Taiwan, the United States also issued a series of joint communiques between 1972 and 1982 with the People's Republic of China ("PRC"). Those communiques included discussion of the status of Taiwan. In the February 28, 1972, Communique, the United States acknowledged "that all Chinese on either side of the Taiwan Strait maintain there is but one China and that Taiwan is a part of China." See United States of America-People's Republic of China  Joint Communique of Feb. 27, 1972 [The Shanghai Communique]--U.S. Department of State Bulletin, Vol. 66 (1972), No. 1708, at 435 (attached as Exhibit 2). In 1979, the two countries issued another Joint Communique regarding the establishment of diplomatic relations between the PRC and the Untied States. See United States of America-People's Republic of China Joint Communique of January 1, 1979 on Establishment of Diplomatic Relations--U.S. Department of State Bulletin, Vol. 79 (1979), No. 2022, at 25 (attached as Exhibit 3). In that Communique, the United States again acknowledged the "Chinese position that there is but one China and Taiwan is part of China." Id. In the third Communique, in 1982, the United States agreed that "[r]espect for each other's sovereignty and territorial integrity and non-interference in each other's internal affairs constitute the fundamental principles guiding United States China relations." See  United States of America-People's Republic of China Joint Communique of Aug. 17, 1982--Weekly Compilation of Presidential Documents (August 23, 1982), at 1039 (attached as Exhibit 4). The two sides also "agreed that the people of the United States would continue to maintain cultural, commercial, and other unofficial relations with the people of Taiwan." Id.

The political branches also made clear that the United States does not exercise sovereignty over Taiwan through the Taiwan Relations Act of 1979, 48 U.S.C. § 3301, which

was passed by Congress and signed into law by the president.  Congress found that the

enactment of this statute was "necessary - (1) to help maintain peace, security, and stability in

the Western Pacific; and (2) to promote the foreign policy of the United States by authorizing the

continuation of commercial, cultural, and other relations between the people of the United States

and the people of Taiwan."  See 22 U.S.C. § 3301(a).  Furthermore, it declared that the policy of

the United States is, inter alia, "to make clear that the United States decision to establish

diplomatic relations with the People's Republic of China rests upon the expectation that the

future of Taiwan will be determined by peaceful means."  22 U.S.C. § 3301(b)(3).  More

importantly for this case, Congress specifically stated in the Taiwan Relation Act that it

approved "the continuation in force of all treaties and other international agreements, including

multilateral conventions, entered into by the United States and the governing authorities on

Taiwan recognized by the United States as the Republic of China prior to January 1, 1979, and in

force between them on December 31, 1978, unless and until terminated in accordance with law."

See 22 U.S.C. § 3303(c) (emphasis added).  This undermines the foundation of the plaintiff's

complaint that the United States has retained control over Taiwan since General MacArthur's

Order in 1945.  Thus, the United States did not exercise sovereignty over Taiwan prior to the

Taiwan Relations Act,[4] nor does it currently exercise such sovereignty.  The United States now

---

[4]The Mutual Defense Treaty signed between the United States and the Republic of China
in 1954, after MacArthur's General Order No. 1, specified that "the terms 'territorial' and
'territories' shall mean in respect of the Republic of China, Taiwan and the Pescadores: and in
respect of the United States of America, the inland territories in the West Pacific under its
jurisdiction.  See Mutual Defense Treaty, Article VI, Treaties and International Acts Series 3178
(1955).  In 1979, President Carter terminated the Mutual Defense Treaty, but that does not
negate the fact that prior to 1979, it was clear United States policy that the Republic of China
exercised sovereignty over Taiwan.  See U.S. Department of State Bulletin, Vol. 79 (1979), No.
2023 at 25.

exercises nonofficial relations with Taiwan through the American Institute in Taiwan.  See 22

U.S.C. § 3310a ("[t]he American Institute of Taiwan shall employ personnel to perform duties

similar to those performed by personnel of the United States and Foreign Commercial Service.").

      Plaintiffs request this Court to ignore this intricate relationship and issue a ruling that the

United States has sovereignty over Taiwan based on an order regarding the manner in which the

Japanese troops surrendered to the Allied Powers.  See Compl. at ¶ 2.  For this Court to issue

such a ruling in this case would have the "potentiality of embarrassment from multifarious

pronouncements by various departments on one question."  See Baker v. Carr, 369 U.S. at 217.

The Executive and Congress have spoken consistently about the United States relations with

Taiwan.  This Court would have to make an "initial policy determination of a kind clearly for

nonjudicial discretion" to go beyond the path chosen by the political branches of the

government, which would be a "lack of the respect due coordinate branches of government."

See id.  Furthermore, due to the delicate relationship between the United States and the PRC, and

the need to preserve the stability and peace in the Taiwan Strait, there is "an unusual need for

unquestioning adherence to a political decision already made."  See id.  In addition, it is unclear

what "judicially discoverable and manageable standard" this Court would use in determining the

default status of a territory that was referenced by MacArthur's General Order dictating the

terms of a surrender.  See id.  These issues are directly related to the prominence of a

"demonstrable constitutional commitment of [the determination of who is a sovereign of a

territory] to a coordinate political department."  See id.

      Resolving the merits of this action would not just intrude on the delicate relationship

between the United States and the PRC, but would also "require the court to determine the

effects on [] agreements on the rights of [] citizens with respect to events occurring outside the United States." See Hwang Geum Joo v. Japan, 413 F.3d at 51, 53 (holding that it is a non-justiciable political question to decide "whether the governments of the [plaintiffs in the case] resolved their claims in negotiating peace with Japan" following World War II) (citation omitted). For this Court to decide this case, it would need not only to look to the treaties and agreements involving the United States but would also have to interpret the treaty between the ROC and Japan. See Compl. at ¶ 42 ("[t]he Treaty of Peace between the ROC, which was signed on April 28, 1952, and entered into force on August 5, 1952 (the "Treaty of Taipei"), did not transfer sovereignty over Taiwan (Formosa) from Japan to China"). Given that this case not only presents questions best left to the political branches of the United States but also involves diplomatic relations between other countries, this action should be dismissed as being a non-justiciable political question.

**C.    The Statutes Cited by Plaintiffs Do Not Confer Jurisdiction on This Court**

**1.    The Little Tucker Act is Not Applicable; Plaintiffs are not seeking Monetary Damages**

In their complaint, plaintiffs list two statutory bases for jurisdiction, 28 U.S.C. §§ 1331 and 1346(a)(2). See Compl. at ¶ 16. The latter can be disposed of quickly. Section 1346(a)(2) is also known as the "Little Tucker Act." See Van Drasek v. Lehman, 762 F.2d 1065, 1067 n. 1 ("[t]he Tucker Act consists of 28 U.S.C. § 1491, which sets out the jurisdiction of the [Court of Federal Claims], and § 1346(a)(2), which gives concurrent jurisdiction to the district courts for claims not exceeding $10,000."). For a claim to fall under the Tucker Act, it "must be for money damages against the United States." United States v. Mitchell, 463 U.S. 206, 217 (1983) (citing United States v. King, 395 U.S. 1, 2-3 (1969)); see also Van Drasek v. Lehman, 762 F.2d at 1068

(same).  Plaintiffs' action is brought for declaratory relief.  <u>See</u> Compl. at ¶ 18.  Because plaintiffs are not seeking any monetary relief, the Tucker Act provides no basis for jurisdiction in this case.

> **2.     This Court Has No Federal Question Jurisdiction**

Plaintiffs' other statutory basis for jurisdiction, federal question jurisdiction under 28 U.S.C. § 1331, meets the same fate.  A district court has jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  Plaintiffs bring this action based on General MacArthur's General Order No. 1 that he issued as Supreme Commander for the Allied Powers in the Pacific, not on the Constitution, laws, or treaties of the United States.  <u>See</u> Compl. at ¶ 46 ("[f]rom 1945 to the present, Taiwan has been an occupied territory of the United States"); <u>see also</u> Compl. at ¶ 47 ("[t]he agency relationship between the United States, the principal, and the ROC, its agent in Taiwan, never terminated.  General Douglas MacArthur's General Order No. 1 empowering the government of ROC to accept the surrender of the Japanese troops in Taiwan and to occupy Taiwan on behalf of the Allied Powers (led by the United States) following the Pacific War is still valid.").

A claim that purportedly arises under MacArthur's General Order is certainly not a claim that arises under a law of the United States.  As plaintiffs maintain in their complaint, General MacArthur issued General Order No. 1 as the "Supreme Commander for the <u>Allied Powers</u>."  <u>See</u> Compl. at ¶ 1 (emphasis added).  General MacArthur's authority was not based on power being exercised by the United States, but rather by that of the Allied Powers.  <u>See</u> Japanese Order (the order stated that the Japanese were to "surrender unconditionally to commanders acting on behalf of the United States, the Republic of China, the United Kingdom and the British

Empire, and the Union of Soviet Socialist Republic, as indicated hereafter or as may be further directed by the Supreme Commander for the Allied Powers."); see also Hirota v. General of the Army MacArthur, 338 U.S. 197, 198 (1948) (finding that the tribunal established by the Allied Powers is "not a tribunal of the United States" and that the "military tribunal . . . has been set up by General MacArthur as the agent of the Allied Powers) (emphasis added).

       Even if the General Order was issued by the United States, this Court would not have federal question jurisdiction. An order designed to establish the surrender terms for an opposing force performs more of an administrative housekeeping function than even Executive Orders, and those are not necessarily considered laws for purposes of conferring jurisdiction under 28 U.S.C. § 1331. See Local 1498, Am. Federation of Government Emp. v. American Federation of Government Emp., AFL/ CIO, 522 F.2d 486, 491 (3rd Cir. 1975) (finding that the Executive Order at issue did not constitute a "'law of the United States' within the meaning of s 1331"). An Executive Order falls only within the meaning of section 1331 when it is "designed to implement and effectuate the statutes under which they were promulgated." Compare id. and Stevens v. Carey, 483 F.2d 188 (7th Cir. 1973) with Farkas v. Texas Instruments, Inc., 375 F.2d 629 (5th Cir. 1967) and Farmer v. Philadelphia Elec. Co., 329 F.2d 3 (3rd Cir. 1964). MacArthur's General Order did not implement or effectuate any statute; it merely instructed Japan on how to order its troops to surrender to the Allied Powers.

       This action also does not arise under the Constitution, even though plaintiffs "filed this action to have this Court determine what fundamental rights, if any, they may have under United States laws." See Compl. at ¶ 3. Plaintiffs rely on their alleged status as "persons subject to the jurisdiction of the United States" as the basis for this Court "to preserve [their] Constitutional

rights." See Compl., Relief Requested.  Plaintiffs therefore acknowledge that they are not

entitled to these Constitutional rights if they are not subject to the jurisdiction of the United

States.  See, e.g., Compl., Relief Requested at (a) ("[p]laintiffs, by virtue of living in a territory

subject to the jurisdiction of the United States, have fundamental rights under United States laws,

including the United States Constitution") (emphasis added).  Furthermore, while plaintiffs

reference treaties, they do no rely upon them as a basis for jurisdiction.  Rather, they maintain

that the General Order created the supposed agency relationship between the United States and

the ROC concerning Taiwan and that "[n]either the Treaty of San Francisco nor the Taiwan

Relations Act nor any other legal instrument terminated the agency relationship between the

Untied States and the ROC for the purpose of the occupation and administration of Taiwan."

See Compl. at ¶ 47 (emphasis added).  Again, plaintiffs rely solely on the General Order as the

instrument that they assert establishes United States sovereignty over Taiwan.

Therefore, this action does not arise under any of the different bases for federal question

jurisdiction.  Without any statutory basis for jurisdiction, this Court lacks subject matter

jurisdiction in the present case.  See Insurance Corp. of Ireland, LTD. v. Compagnie des

Bauxites de Guniee, 456 US at 701 ("[j]urisdiction of the lower federal courts is further limited

to those subjects encompassed within a statutory grant of jurisdiction").

### D.    THE UNITED STATES HAS NOT WAIVED ITS SOVEREIGN IMMUNITY FOR THIS ACTION

As sovereign, absent its consent, the United States is immune from being sued.  See

F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994) (explaining that sovereign immunity is

jurisdictional in nature and that "[i]t is axiomatic that the United States may not be sued without

its consent and that the existence of consent is a prerequisite for jurisdiction") (citations

- 18 -

omitted).  A court does not have jurisdiction in an action against the United States unless the

United States has explicitly waived its sovereign immunity.  See United States v. King, 395 U.S.

1, 4 (1969) (a waiver of sovereign immunity "cannot be implied but must be unequivocally

expressed"); see also Dorsey v. U.S. Dept. of Labor, 41 F.3d 1551, 1555 (D.C. Cir. 1994)

("federal government's waiver of sovereign immunity must be unequivocally expressed")

(internal quotation marks omitted).  That waiver must be based on "specific statutory consent."

See United States v. Shaw, 309 U.S. 495, 500-501 (1940) ("without specific statutory consent,

no suit may be brought against the United States"); see also Jackson v. Bush, 448 F.Supp. 2d

198, 200 (D.D.C. 2006) ("doctrine of sovereign immunity bars those suits against the United

States that are not specifically waived by statute").

        In this action, there is no statutory authority that provides a waiver of sovereign

immunity by the United States.[5]  Without a waiver of sovereign immunity, this Court has no

jurisdiction over this action.

## II.    PLAINTIFFS FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

        A complaint "fails to state a claim upon which relief may be granted" if "there is no

private cause of action" authorized by Congress.  See Stanford v. Potomac Elec. Power Co., 394

F.Supp.2d 81, 90 n. 10 (D.D.C. 2005) ("defendant correctly asserts in its motion to dismiss that

this claim fails to state a claim upon which relief may be granted because there is no private

cause of action under [the statute]").  The Supreme Court has stated that without a private right

of action, "a cause of action does not exist and courts may not create one, no matter how

---

[5]As explained in the discussion of the Little Tucker Act, that statute is not applicable in
this case because plaintiffs are not seeking any monetary damages against the United States.

- 19 -

desirable that might be as a policy matter, or how compatible with the statute."  See Alexander v. Sandoval, 532 U.S. 275, 286-87 (1999).  Furthermore, "private rights of action to enforce federal law must be created by Congress." Id. at 286.  This doctrine applies to all actions, not just those arising under statutes.  For example, "[a]bsent express language in a treaty providing for particular judicial remedies, the federal court will not vindicate private rights unless a treaty creates fundamental rights on a par with those protected by the Constitution."  See United States v. Emuegbunam, 268 F.3d 377, 390 (6th Cir. 2001); see also Hanoch Tel-Oren v. Libyan Arab Republic, 517 F.Supp. 542, 546 (D.D.C. 1981) ("treaties must provide expressly for a private right of action before an individual can assert a claim thereunder in federal court.") (aff'd 726 F.2d 774 (D.C. Cir.1984)).  The same is even true for Executive Orders.  See Meyer v. Bush, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993) ("[a]n Executive Order devoted solely to the internal management of the executive branch-and one which does not create any private rights-is not, for instance, subject to judicial review.").  Because plaintiffs point to no basis for a private right of action, this action should be dismissed for failure to state a claim upon which may be granted.

## <u>CONCLUSION</u>

For the reasons stated above, defendant respectfully requests this Court to grant its

motion to dismiss.


Dated: January 12, 2006     Respectfully submitted,
             PETER D. KEISLER
             Assistant Attorney General

             JEFFREY A. TAYLOR
             United States Attorney for the District of Columbia

             VINCENT M. GARVEY
             Deputy Director, Federal Programs Branch

<u>Of Counsel</u>          _/s/_____
James G. Hergen (D.C. Bar #116382)   ADAM D. KIRSCHNER
Assistant Legal Adviser for      Trial Attorney
East and South Asian Affairs     U.S. Department of Justice
Office of the Legal Adviser      Civil Division, Federal Programs Branch
U.S. Department of State      <u>Mailing Address</u>
Washington, D.C. 20520      P.O. Box 883
             Washington, D.C., 20044
             <u>Delivery Address</u>
             20 Massachusetts Ave., NW., Room 7126
             Washington, DC 20001
             Telephone: (202) 353-9265
             Fax: (202) 616-8470
             Adam.Kirschner@usdoj.gov

             COUNSEL FOR DEFENDANT

for our discussion or debate. Nor is it for us here to meet, representing as we do a majority of the peoples of the earth, in a spirit of distrust, malice, or hatred. But rather it is for us, both victors and vanquished, to rise to that higher dignity which alone benefits the sacred purposes we are about to serve, committing all of our peoples unreservedly to faithful compliance with the undertakings they are here formally to assume.

It is my earnest hope and indeed the hope of all mankind that from this solemn occasion a better world shall emerge out of the blood and carnage of the past—a world founded upon faith and understanding—a world dedicated to the dignity of man and the fulfillment of his most cherished wish—for freedom, tolerance, and justice.

The terms and conditions upon which the surrender of the Japanese Imperial forces is here to be given and accepted are contained in the instrument of surrender now before you.

### PROMISE FULL JUSTICE

As Supreme Commander for the Allied Powers, I announce it my firm purpose, in the tradition of the countries I represent, to proceed in the discharge of my responsibilities with justice and tolerance, while taking all necessary dispositions to insure that the terms of surrender are fully, promptly, and faithfully complied with.

I now invite the representatives of the Emperor of Japan and the Japanese Government and the Japanese Imperial General Headquarters to sign the instrument of surrender at the places indicated.

The Supreme Commander for the Allied Powers will now sign on behalf of the nations at war with Japan.

The representatives of the United States of America will sign now.

The representative of the Republic of China will now sign.

The representative of the United Kingdom will now sign.

The representative of the Union of Soviet Socialist Republics will now sign.

The representative of Australia will now sign.

The representative of Canada will now sign.

The representative of France will now sign.

The representative of the Netherlands will now sign.

The representative of New Zealand will now sign.

Let us pray that peace be now restored to the world, and that God will preserve it always. These proceedings are closed.

### NIMITZ'S REMARKS

On board all vessels at sea and in port, and at our many island bases in the Pacific, there is rejoicing and thanksgiving. The long and bitter struggle, which Japan started so treacherously on the 7th of December 1941, is at an end.

I take great pride in the American forces which have helped to win this victory. America can be proud of them. The officers and men of the United States Army, Navy, Marine Corps, Coast Guard, and merchant marine who fought in the Pacific have written heroic new chapters in this Nation's military history. I have infinite respect for their courage, resourcefulness, and devotion to duty. We also acknowledge the great contribution to this victory made by our valiant Allies. United we fought and united we prevail.

The port of Tokyo, which was first opened by Commodore Perry in 1858, is now crowded with United States men-of-war. The process of bringing Japan into the family of civilized nations, which was interrupted when Japan launched her program of conquest, will soon begin again.

### PAYS TRIBUTE TO THE DEAD

Today all freedom-loving peoples of the world rejoice in the victory and feel pride in the accomplishments of our combined forces. We also pay tribute to those who delivered our freedom at the cost of their lives.

On Guam is a military cemetery in a green valley not far from my headquarters. The ordered rows of white crosses stand as reminders of the heavy cost we have paid for victory. On these crosses are the names of American soldiers, sailors and marines—Culpepper, Tomasino, Sweeney, Bromberg, Depew, Melloy, Fontani—names that are a cross-section of democracy. They fought together side by side. To them we have a solemn obligation—the obligation to insure that their sacrifice will help to make this a better and safer world in which to live.

To achieve this it will be necessary for the United Nations to enforce rigidly the peace terms that will be imposed upon Japan. It will also be necessary to maintain our national strength at a level which will discourage future acts of aggression aimed at the destruction of our way of life.

Now we turn to the great tasks of reconstruction and restoration. I am confident that we will be able to apply the same skill, resourcefulness, and keen thinking to these problems as were applied to the problems of winning the victory.

### MACARTHUR'S CONCLUDING ADDRESS

My fellow countrymen, today the guns are silent. A great tragedy has ended. A great victory has been won. The skies no longer rain death—the seas bear only commerce—men everywhere walk upright in the sunlight. The entire world is quietly at peace. The holy mission has been completed, and in reporting this to you, the people, I speak for the thousands of silent lips, forever stilled among the jungles and the beaches and in the deep waters of the Pacific which marked the way. I speak for the unnamed brave millions homeward bound to take up the challenge of that future which they did so much to salvage from the brink of disaster.

As I look back on the long, tortuous trail from those grim days of Bataan and Corregidor, when an entire world lived in fear; when democracy was on the defensive everywhere, when modern civilization trembled in the balance, I thank a merciful God that He has given us the faith, the courage, and the power from which to mold victory.

We have known the bitterness of defeat and the exultation of triumph, and from both we have learned there can be no turning back. We must go forward to preserve in peace what we won in war.

### "LAST CHANCE" FOR PEACE

A new era is upon us. Even the lesson of victory itself brings with it profound concern, both for our future security and the survival of civilization. The destructiveness of the war potential, through progressive advances in scientific discovery, has in fact now reached a point which revises the traditional concept of war.

Men since the beginning of time have sought peace. Various methods through the ages have attempted to devise an international process to prevent or settle disputes between nations. From the very start workable methods were found insofar as individual citizens were concerned, but the mechanics of an instrumentality of larger international scope have never been successful. Military alliance, balances of power, League of Nations all in turn failed, leaving the only path to be by way of the crucible of war.

The utter destructiveness of war now blots out this alternative. We have had our last chance. If we do not now devise some greater and more equitable system Armageddon will be at our door. The problem basically is theological and involves a spiritual recrudescence and improvement of human character that will synchronize with our almost matchless advance in science, art, literature, and all material and cultural developments of the past 2,000 years. It must be of the spirit if we are to save the flesh.

We stand in Tokyo today reminiscent of our countryman, Commodore Perry, 92 years ago. His purpose was to bring to Japan an era of enlightenment and progress by lifting the veil of isolation to the friendship, trade, and commerce of the world. But alas the knowledge thereby gained of western science was forged into an instrument of oppression and human enslavement. Freedom of expression, freedom of action, even freedom of thought were denied through suppression of liberal education, through appeal to superstition, and through the application of force.

### HOPES TO EDUCATE JAPANESE

We are committed to the Potsdam Declaration of Principles to see that the Japanese people are liberated from this condition of slavery. It is my purpose to implement this commitment just as rapidly as the armed forces are demobilized and other essential steps taken to neutralize the war potential. The energy of the Japanese race, if properly directed, will enable expansion vertically rather than horizontally. If the talents of the race are turned into constructive channels, the country can lift itself from its present deplorable state into a position of dignity.

To the Pacific basin has come the vista of a new emancipated world. Today, freedom is on the offensive, democracy is on the march. Today, in Asia as well as in Europe, unshackled peoples are tasting the full sweetness of liberty, the relief from fear.

In the Philippines, America has evolved a model for this new free world of Asia. In the Philippines, America has demonstrated that peoples of the East and peoples of the West may walk side by side in mutual respect and with mutual benefit. The history of our sovereignty there has now the full confidence of the East.

And so, my fellow-countrymen, today I report to you that your sons and daughters have served you well and faithfully with the calm, deliberate, determined fighting spirit of the American soldier and sailor. Based upon a tradition of historical trait, as against the fanaticism of any enemy supported only by mythological notion, their spiritual strength and power has brought us through to victory. They are homeward bound—take care of them.

### TEXT OF JAPANESE ORDER

(1) The Imperial General Headquarters by direction of the Emperor, and pursuant to the surrender to the Supreme Commander for the Allied powers of all Japanese armed forces by the Emperor, hereby orders all of its commanders in Japan and abroad to cause the Japanese armed forces and Japanese-controlled forces under their command to cease hostilities at once, to lay down their arms, to remain in their present locations and to surrender unconditionally to commanders acting on behalf of the United States, the Republic of China, the United Kingdom and the British Empire, and the Union of Soviet Socialist Republics, as indicated hereafter or as may be further directed by the Supreme Commander for the Allied Powers.

Immediate contact will be made with the indicated commanders, or their designated representatives, subject to any changes in detail prescribed by the Supreme Commander for the Allied Powers, and their instructions will be completely and immediately carried out.

(a) The senior Japanese commanders and all ground, sea, air, and auxiliary forces

within China (excluding Manchuria), Formosa, and French Indochina north of 16 degrees north latitude shall surrender to Generalissimo Chiang Kai-shek.

(b) The senior Japanese commanders and all ground, sea, air, and auxiliary forces within Manchuria, Korea north of 38 degrees north latitude and Karafuto shall surrender to the commander in chief of Soviet forces in the Far East.

(c) The senior Japanese commanders and all ground, sea, air, and auxiliary forces within the Andamans, Nicobars, Burma, Thailand, French Indo-China south of 16 degrees north latitude, Malaya, Borneo, Netherlands Indies, New Guinea, Bismarcks, and the Solomons, shall surrender to the Supreme Allied Commander, South East Asia Command, or the commanding general, Australians, to be arranged between them, and the details of this paragraph then prepared by the Supreme Commander for the Allied Powers.

(d) The senior Japanese commanders and all ground, sea, air, and auxiliary forces in the Japanese-mandated islands, Ryukyus, Bonins, and other Pacific islands shall surrender to the Commander in Chief, United States Pacific Fleet.

(e) The Imperial General Headquarters, its senior commanders, and all ground, sea, air, and auxiliary forces in the main islands of Japan, minor islands adjacent thereto, Korea south of 38 degrees north latitude, and the Philippines shall surrender to the commander in chief, United States Army Forces in the Pacific.

(f) The above indicated commanders are the only representatives of the Allied Powers empowered to accept surrender, and all surrenders of Japanese forces shall be made only to them or to their representatives.

The Japanese Imperial General Headquarters further orders its commanders in Japan and abroad to disarm completely all forces of Japan or under Japanese control, wherever they may be situated, and to deliver intact and in safe and good condition all weapons and equipment at such time and at such places as may be prescribed by the Allied commanders indicated above.

Pending further instructions, the Japanese police force in the main islands of Japan will be exempt from this disarmament provision.

The police force will remain at their posts and shall be held responsible for the preservation of law and order. The strength and arms of such a police force will be prescribed.

## MUST LIST ALL HOLDINGS

(2) The Japanese Imperial General Headquarters shall furnish to the Supreme Commander for the Allied Powers within (time limit) of receipt of this order complete information with respect to Japan and all areas under Japanese control as follows:

(a) Lists of all land, air, and antiaircraft units showing locations and strengths in officers and men.

(b) Lists of all aircraft, military, naval and civil, giving complete information as to the number, type, location, and condition of such aircraft.

(c) Lists of all Japanese and Japanese-controlled naval vessels, surface and submarine and auxiliary naval craft in or out of commission and under construction, giving their position, condition, and movement.

(d) Lists of all Japanese and Japanese-controlled merchant ships of over 100 gross tons in or out of commission and under construction, including merchant ships formerly belonging to any of the United Nations now in Japanese hands, giving position, condition, and movement.

(e) Complete and detailed information, accompanied by maps showing locations and layouts of all mines, mine fields, and other obstacles to movement by land, sea, and air and the safety lanes in connection therewith.

(f) Locations and descriptions of all military installations and establishments, including airfields, seaplane bases, antiaircraft defenses, ports and naval bases, storage depots, permanent and temporary land and coast fortifications, fortresses and other fortified areas.

(g) Locations of all camps and other places of detention of United Nations prisoners of war and civilian internees.

## PLANES ORDERED GROUNDED

(3) Japanese armed forces and civil aviation authorities will insure that all Japanese military and naval and civil aircraft remain on the ground, the water, or aboard ship until further notification on the disposition to be made of them.

(4) Japanese or Japanese-controlled naval or merchant vessels of all types will be maintained without damage and will undertake no movement pending instructions from the Supreme Commander for the Allied Powers. Vessels at sea will remove explosives of all types to safe storage ashore.

(5) Responsible Japanese or Japanese-controlled military and civil authorities will insure that:

(a) All Japanese mines, mine fields, and other obstacles to movement by land, sea, and air wherever located be removed according to instructions of the Supreme Commander for the Allied Powers.

(b) All aids to navigation be reestablished at once.

(c) All safety lanes be kept open and clearly marked pending accomplishment of (a) above.

(6) Responsible Japanese and Japanese-controlled military and civil authorities will hold intact and in good condition pending further instructions from the Supreme Commander for the Allied Powers the following:

(a) All arms, ammunitions, explosives, military equipment, stores and supplies, and other implements of war of all kinds and all other war material (except as specifically prescribed in section 4 of this order).

(b) All land, water, and air transportation, and communication facilities and equipment.

(c) All military installations and establishments including airfields, seaplane bases, antiaircraft defenses, ports and naval bases, storage depots, permanent and temporary land and coast fortifications, fortresses and other fortified areas together with plans and drawings of all such fortifications, installations and establishments.

## ARMS PLANTS TO BE KEPT INTACT

(d) All factories, plants, shops, research institutions, laboratories, testing stations, technical data, patents, plans, drawings and inventions designed or intended to produce or to facilitate the production or use of all implements of war and other material and property used or intended for use by any military or part-military organization in connection with its operations.

(7) The Japanese Imperial General Headquarters shall furnish to the Supreme Commander for the Allied Powers within (time limit) of receipt of this order complete lists of all the items specified in paragraphs a, b, and d of section 6 above, indicating the numbers, types, and locations of each.

(8) The manufacture and distribution of all arms, ammunition, and implements of war will cease forthwith.

(9) With respect to United Nations prisoners-of-war and civilian internees in the hands of Japanese or Japanese-controlled authorities:

(a) The safety and well-being of all United Nations prisoners-of-war and civilian internees will be scrupulously preserved to include the administrative and supply service essential to provide adequate food, shelter, clothing, and medical care until such responsibility is undertaken by the Supreme Commander for the Allied Powers.

(b) Each camp or other place of detention of United Nations prisoners of war and civilian internees together with its equipment, stores, records, arms, and ammunition will be delivered immediately to the command of the senior officer designated representative of the prisoners of war and civilian internees.

(c) As directed by the Supreme Commander for the Allied Powers, prisoners of war and civilian internees will be transported to places of safety where they can be accepted by Allied authorities.

(d) The Japanese Imperial General Headquarters will furnish to the Supreme Commander for the Allied Powers within (time limit) of the receipt of this order complete lists of all United Nations prisoners of war and civilian internees indicating their location.

(10) All Japanese and Japanese-controlled military and civil authorities shall aid and assist the occupation of Japan and Japanese-controlled areas by forces of the Allied Powers.

(11) The Japanese Imperial General Headquarters and appropriate Japanese officials shall be prepared on instructions from Allied occupation commanders to collect and deliver all arms in the possession of the Japanese civilian population.

(12) This and all subsequent instructions issued by the Supreme Commander for the Allied Forces or of other Allied military authorities will be scrupulously and promptly obeyed by Japanese and Japanese-controlled military and civil officials and private persons.

Any delay or failure to comply with the provisions of this or subsequent orders, and any action which the Supreme Commander for the Allied Powers determines to be detrimental to the Allied Powers, will incur drastic and summary punishment at the hands of the Allied military authorities and the Japanese Government.

## TEXT OF ADDRESS BY PRESIDENT TRUMAN PROCLAIMING VJ-DAY

My fellow Americans, the thoughts and hopes of all America—indeed of all the civilized world—are centered tonight on the battleship *Missouri*. There on that small piece of American soil anchored in Tokyo Harbor the Japanese have just officially laid down their arms. They have signed terms of unconditional surrender.

Four years ago the thoughts and fears of the whole civilized world were centered on another piece of American soil—Pearl Harbor. The mighty threat to civilization which began there is now laid at rest. It was a long road to Tokyo—and a bloody one.

We shall not forget Pearl Harbor.

The Japanese militarists will not forget the U. S. S. *Missouri*.

The evil done by the Japanese war lords can never be repaired or forgotten. But their power to destroy and kill has been taken from them. Their armies and what is left of their navy is now impotent.

To all of us there comes first a sense of gratitude to Almighty God who sustained us and our Allies in the dark days of grave danger, who made us to grow from weakness into the strongest fighting force in history, and who now has seen us overcome the forces of tyranny that sought to destroy His civilization.

God grant that in our pride of the hour we may not forget the hard tasks that are still before us; that we may approach these with the same courage, zeal, and patience with which we faced the trials and problems of the past 4 years.

## "NO VICTORY" CAN REPAIR LOSS

Our first thoughts, of course—thoughts of gratefulness and deep obligation—go out to those of our loved ones who have been killed or maimed in this terrible war. On land and sea and in the air American men and women have given their lives so that this day of ultimate victory might come and assure the

rules of international conduct which will reduce the risk of confrontation and war in Asia and in the Pacific.

We agreed that we are opposed to domination of the Pacific area by any one power. We agreed that international disputes should be settled without the use of the threat of force and we agreed that we are prepared to apply this principle to our mutual relations.

With respect to Taiwan, we stated our established policy that our forces overseas will be reduced gradually as tensions ease, and that our ultimate objective is to withdraw our forces as a peaceful settlement is achieved.

We have agreed that we will not negotiate the fate of other nations behind their backs, and we did not do so at Peking. There were no secret deals of any kind. We have done all this without giving up any United States commitment to any other country.

In our talks, the talks that I had with the leaders of the People's Republic and that the Secretary of State had with the office of the Government of the People's Republic in the foreign affairs area, we both realized that a bridge of understanding that spans almost 12,000 miles and 22 years of hostility can't be built in 1 week of discussions. But we have agreed to begin to build that bridge, recognizing that our work will require years of patient effort. We made no attempt to pretend that major differences did not exist between our two governments, because they do exist.

This communique was unique in honestly setting forth differences rather than trying to cover them up with diplomatic doubletalk.

One of the gifts that we left behind in Hangchow was a planted sapling of the American redwood tree. As all Californians know, and as most Americans know, redwoods grow from saplings into the giants of the forest. But the process is not one of days or even years; it is a process of centuries.

Just as we hope that those saplings, those tiny saplings that we left in China, will grow one day into mighty redwoods, so we hope,

too, that the seeds planted on this journey for peace will grow and prosper into a more enduring structure for peace and security in the Western Pacific.

But peace is too urgent to wait for centuries. We must seize the moment to move toward that goal now, and this is what we have done on this journey.

As I am sure you realize, it was a great experience for us to see the timeless wonders of ancient China, the changes that are being made in modern China. And one fact stands out, among many others, from my talks with the Chinese leaders. It is their total belief, their total dedication, to their system of government. That is their right, just as it is the right of any country to choose the kind of government it wants.

But as I return from this trip, just as has been the case on my return from other trips abroad which have taken me to over 80 countries, I come back to America with an even stronger faith in our system of government.

As I flew across America today, all the way from Alaska, over the Rockies, the Plains, and then on to Washington, I thought of the greatness of our country and, most of all, I thought of the freedom, the opportunity, the progress that 200 million Americans are privileged to enjoy. I realized again this is a beautiful country. And tonight my prayer and my hope is that as a result of this trip, our children will have a better chance to grow up in a peaceful world.

Thank you.

## TEXT OF JOINT COMMUNIQUE, ISSUED AT SHANGHAI, FEBRUARY 27

President Richard Nixon of the United States of America visited the People's Republic of China at the invitation of Premier Chou En-lai of the People's Republic of China from February 21 to February 28, 1972. Accompanying the President were Mrs. Nixon, U.S. Secretary of State William Rogers, Assistant to the President Dr. Henry Kissinger, and other American officials.

President Nixon met with Chairman Mao

HeinOnline -- 66 Dep't St. Bull. 435 1972

Tse-tung of the Communist Party of China on February 21. The two leaders had a serious and frank exchange of views on Sino-U.S. relations and world affairs.

During the visit, extensive, earnest and frank discussions were held between President Nixon and Premier Chou En-lai on the normalization of relations between the United States of America and the People's Republic of China, as well as on other matters of interest to both sides. In addition, Secretary of State William Rogers and Foreign Minister Chi Peng-fei held talks in the same spirit.

President Nixon and his party visited Peking and viewed cultural, industrial and agricultural sites, and they also toured Hang-chow and Shanghai where, continuing discussions with Chinese leaders, they viewed similar places of interest.

The leaders of the People's Republic of China and the United States of America found it beneficial to have this opportunity, after so many years without contact, to present candidly to one another their views on a variety of issues. They reviewed the international situation in which important changes and great upheavals are taking place and expounded their respective positions and attitudes.

The U.S. side stated: Peace in Asia and peace in the world requires efforts both to reduce immediate tensions and to eliminate the basic causes of conflict. The United States will work for a just and secure peace: just, because it fulfills the aspirations of peoples and nations for freedom and progress; secure, because it removes the danger of foreign aggression. The United States supports individual freedom and social progress for all the peoples of the world, free of outside pressure or intervention. The United States believes that the effort to reduce tensions is served by improving communication between countries that have different ideologies so as to lessen the risks of confrontation through accident, miscalculation or misunderstanding. Countries should treat each other with mutual respect and be willing to compete peacefully, letting per-

formance be the ultimate judge. No country should claim infallibility and each country should be prepared to re-examine its own attitudes for the common good. The United States stressed that the peoples of Indochina should be allowed to determine their destiny without outside intervention; its constant primary objective has been a negotiated solution; the eight-point proposal put forward by the Republic of Vietnam and the United States on January 27, 1972 represents a basis for the attainment of that objective; in the absence of a negotiated settlement the United States envisages the ultimate withdrawal of all U.S. forces from the region consistent with the aim of self-determination for each country of Indochina. The United States will maintain its close ties with and support for the Republic of Korea; the United States will support efforts of the Republic of Korea to seek a relaxation of tension and increased communication in the Korean peninsula. The United States places the highest value on its friendly relations with Japan; it will continue to develop the existing close bonds. Consistent with the United Nations Security Council Resolution of December 21, 1971, the United States favors the continuation of the ceasefire between India and Pakistan and the withdrawal of all military forces to within their own territories and to their own sides of the ceasefire line in Jammu and Kashmir; the United States supports the right of the peoples of South Asia to shape their own future in peace, free of military threat, and without having the area become the subject of great power rivalry.

The Chinese side stated: Wherever there is oppression, there is resistance. Countries want independence, nations want liberation and the people want revolution—this has become the irresistible trend of history. All nations, big or small, should be equal; big nations should not bully the small and strong nations should not bully the weak. China will never be a superpower and it opposes hegemony and power politics of any kind. The Chinese side stated that it firmly supports the struggles of all the oppressed people and nations for freedom and liberation and that the people of all countries have the right to

HeinOnline -- 66 Dep't St. Bull. 436 1972

choose their social systems according to their own wishes and the right to safeguard the independence, sovereignty and territorial integrity of their own countries and oppose foreign aggression, interference, control and subversion. All foreign troops should be withdrawn to their own countries.

The Chinese side expressed its firm support to the peoples of Vietnam, Laos and Cambodia in their efforts for the attainment of their goal and its firm support to the seven-point proposal of the Provisional Revolutionary Government of the Republic of South Vietnam and the elaboration of February this year on the two key problems in the proposal, and to the Joint Declaration of the Summit Conference of the Indochinese Peoples. It firmly supports the eight-point program for the peaceful unification of Korea put forward by the Government of the Democratic People's Republic of Korea on April 12, 1971, and the stand for the abolition of the "U.N. Commission for the Unification and Rehabilitation of Korea." It firmly opposes the revival and outward expansion of Japanese militarism and firmly supports the Japanese people's desire to build an independent, democratic, peaceful and neutral Japan. It firmly maintains that India and Pakistan should, in accordance with the United Nations resolutions on the India-Pakistan question, immediately withdraw all their forces to their respective territories and to their own sides of the ceasefire line in Jammu and Kashmir and firmly supports the Pakistan Government and people in their struggle to preserve their independence and sovereignty and the people of Jammu and Kashmir in their struggle for the right of self-determination.

There are essential differences between China and the United States in their social systems and foreign policies. However, the two sides agreed that countries, regardless of their social systems, should conduct their relations on the principles of respect for the sovereignty and territorial integrity of all states, non-aggression against other states, non-interference in the internal affairs of other states, equality and mutual benefit, and peaceful coexistence. International disputes should be settled on this basis, without resorting to the use or threat of force. The United States and the People's Republic of China are prepared to apply these principles to their mutual relations.

With these principles of international relations in mind the two sides stated that:

—progress toward the normalization of relations between China and the United States is in the interests of all countries;

—both wish to reduce the danger of international military conflict;

—neither should seek hegemony in the Asia-Pacific region and each is opposed to efforts by any other country or group of countries to establish such hegemony; and

—neither is prepared to negotiate on behalf of any third party or to enter into agreements or understandings with the other directed at other states.

Both sides are of the view that it would be against the interests of the peoples of the world for any major country to collude with another against other countries, or for major countries to divide up the world into spheres of interest.

The two sides reviewed the long-standing serious disputes between China and the United States. The Chinese side reaffirmed its position: The Taiwan question is the crucial question obstructing the normalization of relations between China and the United States; the Government of the People's Republic of China is the sole legal government of China; Taiwan is a province of China which has long been returned to the motherland; the liberation of Taiwan is China's internal affair in which no other country has the right to interfere; and all U.S. forces and military installations must be withdrawn from Taiwan. The Chinese Government firmly opposes any activities which aim at the creation of "one China, one Taiwan," "one China, two governments," "two Chinas," and "independent Taiwan" or advocate that "the status of Taiwan remains to be determined."

The U.S. side declared: The United States acknowledges that all Chinese on either side

HeinOnline -- 66 Dep't St. Bull. 437 1972

of the Taiwan Strait maintain there is but one China and that Taiwan is a part of China. The United States Government does not challenge that position. It reaffirms its interest in a peaceful settlement of the Taiwan question by the Chinese themselves. With this prospect in mind, it affirms the ultimate objective of the withdrawal of all U.S. forces and military installations from Taiwan. In the meantime, it will progressively reduce its forces and military installations on Taiwan as the tension in the area diminishes.

The two sides agreed that it is desirable to broaden the understanding between the two peoples. To this end, they discussed specific areas in such fields as science, technology, culture, sports and journalism, in which people-to-people contacts and exchanges would be mutually beneficial. Each side undertakes to facilitate the further development of such contacts and exchanges.

Both sides view bilateral trade as another area from which mutual benefit can be derived, and agreed that economic relations based on equality and mutual benefit are in the interest of the peoples of the two countries. They agree to facilitate the progressive development of trade between their two countries.

The two sides agreed that they will stay in contact through various channels, including the sending of a senior U.S. representative to Peking from time to time for concrete consultations to further the normalization of relations between the two countries and continue to exchange views on issues of common interest.

The two sides expressed the hope that the gains achieved during this visit would open up new prospects for the relations between the two countries. They believe that the normalization of relations between the two countries is not only in the interest of the Chinese and American peoples but also contributes to the relaxation of tension in Asia and the world.

President Nixon, Mrs. Nixon and the American party expressed their appreciation for the gracious hospitality shown them by the Government and people of the People's Republic of China.

## CHRONOLOGY OF EVENTS

Weekly Compilation of Presidential Documents dated February 28

*Thursday, February 17*

After a departure ceremony on the South Lawn of the White House, the President went by helicopter to Andrews Air Force Base for the flight to Hawaii, en route to the People's Republic of China.

Arriving at Kaneohe Marine Corps Air Station, Oahu, Hawaii, the President and Mrs. Nixon motored to the residence of the Commanding General, First Marine Brigade, where they remained until Saturday afternoon, February 19, reading and preparing for the China visit.

*Saturday, February 19–Sunday, February 20*

The President and Mrs. Nixon boarded the Spirit of '76 at Kaneohe Marine Corps Air Station for the 8-hour flight to Guam. Crossing the international date line en route, they arrived at Guam International Airport shortly after 5 p.m. on Sunday, February 20, Guam time. They spent the night at Nimitz Hill, the residence of the Commander, Naval Forces, Marianas.

*Monday, February 21*

At 7 a.m. Guam time, the President and Mrs. Nixon left Guam International Airport for Shanghai, their first stop in the People's Republic of China. They arrived, after a 4-hour flight, at Hung Chiao (Rainbow Bridge) Airport, Shanghai, at 9 a.m., China time, where they were greeted by officials of the People's Republic, headed by Vice Minister of Foreign Affairs Chiao Kuan-hua. After refreshments and a tour of the terminal, the Presidential party again boarded the Spirit of '76, accompanied by Vice Minister Chiao, Chang Wen-chin and Wang Hai-jung of the Foreign Ministry, a Chinese navigator, radio operator, and three interpreters, for the final leg of the flight to Peking.

At about 11:30 a.m., China time, the party arrived at Capital Airport near Peking. Premier Chou En-lai greeted the President and members of his party, stood with the President for the playing of the national anthems of the two countries, and accompanied the President in a review of the troops.

The Premier then accompanied the President in a motorcade to Peking, to Taio Yu Tai (Angling Terrace), the guesthouse where the President and Mrs. Nixon would stay during their visit.

In the afternoon, the President met for an hour

HeinOnline -- 66 Dep't St. Bull. 438 1972

# EAST ASIA:    *U.S. Normalizes Relations With the People's Republic of China*

*Following are the texts of December 15, 1978, of the joint communique between the United States and the People's Republic of China, President Carter's address to the nation and remarks to reporters following the address, and the U.S. statement on normalization.[1]*

## PRESIDENT'S ADDRESS [2]

I would like to read a joint communique which is being simultaneously issued in Peking at this very moment by the leaders of the People's Republic of China.

[At this point, the President read the text of the joint communique.]

Yesterday, our country and the People's Republic of China reached this final historic agreement. On January 1, 1979, a little more than 2 weeks from now, our two governments will implement full normalization of diplomatic relations.

As a nation of gifted people who comprise about one-fourth of the total population of the Earth, China plays, already, an important role in world affairs, a role that can only grow more important in the years ahead.

We do not undertake this important step for transient tactical or expedient reasons. In recognizing the People's Republic of China, that it is the single Government of China, we are recognizing simple reality. But far more is involved in this decision than just the recognition of a fact.

Before the estrangement of recent decades, the American and the Chinese people had a long history of friendship. We've already begun to rebuild some of those previous ties. Now our rapidly expanding relationship requires the kind of structure that only full diplomatic relations will make possible.

The change that I'm announcing tonight will be of great long-term benefit to the peoples of both our country and China—and, I believe, to all the peoples of the world. Normalization—and the expanded commercial and cultural relations that it will bring—will contribute to the well-being of our own nation, to our own national interest, and it will also enhance the stability of Asia. These more positive relations with China can beneficially affect the world in which we live and the world

in which our children will live.

We have already begun to inform our allies and other nations and the Members of the Congress of the details of our intended action. But I wish also tonight to convey a special message to the people of Taiwan—I have already communicated with the leaders in Taiwan—with whom the American people have had and will have extensive, close, and friendly relations. This is important between our two peoples.

As the United States asserted in the Shanghai communique of 1972,[3] issued on President Nixon's historic visit, we will continue to have an interest in the peaceful resolution of the Taiwan issue. I have paid special attention to insuring that normalization of relations between our country and the People's Republic will not jeopardize the well-being of the people of Taiwan. The people of our country will maintain our current commercial, cultural, trade, and other relations with Taiwan through nongovernmental means. Many other countries in the world are already successfully doing this.

These decisions and these actions open a new and important chapter in our country's history and also in world affairs.

To strengthen and to expedite the benefits of this new relationship between China and the United States, I am pleased to announce that Vice Premier Teng has accepted my invitation and will visit Washington at the end of January. His visit will give our governments the opportunity to consult with each other on global issues and to begin working together to enhance the cause of world peace.

These events are the final result of long and serious negotiations begun by President Nixon in 1972 and continued under the leadership of President Ford. The results bear witness to the steady, determined, bipartisan effort of our own country to build a world in which peace will be the goal and the responsibility of all nations.

The normalization of relations between the United States and China has no other purpose than this: the advancement of peace. It is in this spirit, at this season of peace, that I take special pride in sharing this good news with you tonight.

## PRESIDENT'S REMARKS [4]

I wanted to come by and let you know that I believe this to be an extremely important moment in the history of our nation. It's something that I and my two predecessors have sought

---

**JOINT COMMUNIQUE, DEC. 15**

JOINT COMMUNIQUE ON THE ESTABLISHMENT OF DIPLOMATIC RELATIONS BETWEEN THE UNITED STATES OF AMERICA AND THE PEOPLE'S REPUBLIC OF CHINA JANUARY 1, 1979

The United States of America and the People's Republic of China have agreed to recognize each other and to establish diplomatic relations as of January 1, 1979.

The United States of America recognizes the Government of the People's Republic of China as the sole legal Government of China. Within this context, the people of the United States will maintain cultural, commercial, and other unofficial relations with the people of Taiwan.

The United States of America and the People's Republic of China reaffirm the principles agreed on by the two sides in the Shanghai Communique and emphasize once again that:

- Both wish to reduce the danger of international military conflict.
- Neither should seek hegemony in the Asia-Pacific region or in any other region of the world and each is opposed to efforts by any other country or group of countries to establish such hegemony.
- Neither is prepared to negotiate on behalf of any third party or to enter into agreements or understandings with the other directed at other states.
- The Government of the United States of America acknowledges the Chinese position that there is but one China and Taiwan is part of China.
- Both believe that normalization of Sino-American relations is not only in the interest of the Chinese and American peoples but also contributes to the cause of peace in Asia and the world.

The United States of America and the People's Republic of China will exchange Ambassadors and establish Embassies on March 1, 1979.

---

which offers hope for millions of Americans at home, on the farm, and in the workplace?

Do we tell these Americans to give up hope, that their ship of state lies dead in the water because those entrusted with manning that ship can't agree on which sail to raise? We're within sight of the safe port of economic recovery. Do we make port or go aground on the shoals of selfishness, partisanship, and just plain bullheadedness?

The measure the Congress is about to vote on, while not perfect in the eyes of any one of us, will bring us closer to the goal of a balanced budget, restored industrial power, and employment for all who want to work. Together we can reach that goal.

Thank you. God bless you.

*Note: The President spoke at 8:02 p.m. from the Oval Office at the White House. The address was broadcast live on nationwide radio and television.*

## United States Arms Sales to Taiwan

*Joint Communique of the United States and the People's Republic of China.*
*August 17, 1982*

1. In the Joint Communique on the Establishment of Diplomatic Relations on January 1, 1979, issued by the Government of the United States of America and the Government of the People's Republic of China, the United States of America recognized the Government of the People's Republic of China as the sole legal government of China, and it acknowledged the Chinese position that there is but one China and Taiwan is part of China. Within that context, the two sides agreed that the people of the United States would continue to maintain cultural, commercial, and other unofficial relations with the people of Taiwan. On this basis, relations between the United States and China were normalized.

2. The question of United States arms sales to Taiwan was not settled in the course of negotiations between the two countries on establishing diplomatic relations. The two sides held differing positions, and the Chinese side stated that it would raise the issue again following normalization. Recognizing that this issue would seriously hamper the development of United States-China relations, they have held further discussions on it, during and since the meetings between President Ronald Reagan and Premier Zhao Ziyang and between Secretary of State Alexander M. Haig, Jr., and Vice Premier and Foreign Minister Huang Hua in October, 1981.

3. Respect for each other's sovereignty and territorial integrity and non-interference in each other's internal affairs constitute the fundamental principles guiding United States-China relations. These principles were confirmed in the Shanghai Communique of February 28, 1972, and reaffirmed in the Joint Communique on the Establishment of Diplomatic Relations which came into effect on January 1, 1979. Both sides emphatically state that these principles continue to govern all aspects of their relations.

4. The Chinese government reiterates that the question of Taiwan is China's internal affair. The Message to Compatriots in Taiwan issued by China on January 1, 1979, promulgated a fundamental policy of striving for peaceful reunification of the Motherland. The Nine-Point Proposal put forward by China on September 30, 1981, represented a further major effort under this fundamental policy to strive for a peaceful solution to the Taiwan question.

5. The United States Government attaches great importance to its relations with China, and reiterates that it has no intention of infringing on Chinese sovereignty and territorial integrity, or interfering in China's internal affairs, or pursing a policy of "Two Chinas" or "one China, one Taiwan." The United States Government understands and appreciates the Chinese policy of striving for a peaceful resolution of the Taiwan question as indicated in China's Message to Compatriots in Taiwan issued on January 1, 1979, and the Nine-Point Proposal put forward by China on September 30,

1039

1981. The new situation which has emerged with regard to the Taiwan question also provides favorable conditions for the settlement of United States-China differences over the question of United States arms sales to Taiwan.

6. Having in mind the foregoing statements of both sides, the United States Government states that it does not seek to carry out a long-term policy of arms sales to Taiwan, that its arms sales to Taiwan will not exceed, either in qualitative or in quantitative terms, the level of those supplied in recent years since the establishment of diplomatic relations between the United States and China, and that it intends to reduce gradually its sales or arms to Taiwan, leading over a period of time to a final resolution. In so stating, the United States acknowledges China's consistent position regarding the thorough settlement of this issue.

7. In order to bring about, over a period of time, a final settlement of the question of United States arms sales to Taiwan, which is an issue rooted in history, the two governments will make every effort to adopt measures and create conditions conducive to the thorough settlement of this issue.

8. The development of United States-China relations is not only in the interests of the two peoples but also conducive to peace and stability in the world. The two sides are determined, on the principle of equality and mutual benefit, to strengthen their ties in the economic, cultural, educational, scientific, technological and other fields and make strong, joint efforts for the continued development of relations between the governments and peoples of the United States and China.

9. In order to bring about the healthy development of United States-China relations, maintain world peace and oppose aggression and expansion, the two governments reaffirm the principles agreed on by the two sides in the Shanghai Communique and the Joint Communique on the Establishment of Diplomatic Relations. The two sides will maintain contact and hold appropriate consultations on bilateral and international issues of common interest.

## United States Arms Sales to Taiwan

*Statement by the President.*
*August 17, 1982*

The U.S.-China joint communique issued today embodies a mutually satisfactory means of dealing with the historical question of U.S. arms sales to Taiwan. This document preserves principles on both sides and will promote the further development of friendly relations between the governments and peoples of the United States and China. It will also contribute to the further reduction of tensions and to lasting peace in the Asia/Pacific region.

Building a strong and lasting relationship with China has been an important foreign policy goal of four consecutive American administrations. Such a relationship is vital to our long-term national security interests and contributes to stability in East Asia. It is in the national interest of the United States that this important strategic relationship be advanced. This communique will make that possible, consistent with our obligations to the people of Taiwan.

In working toward this successful outcome we have paid particular attention to the needs and interests of the people of Taiwan. My longstanding personal friendship and deep concern for their well-being is steadfast and unchanged. I am committed to maintaining the full range of contacts between the people of the United States and the people of Taiwan—cultural, commercial, and people-to-people contacts—which are compatible with our unofficial relationship. Such contacts will continue to grow and prosper and will be conducted with the dignity and honor befitting old friends.

Regarding future U.S. arms sales to Taiwan, our policy, set forth clearly in the communique, is fully consistent with the Taiwan Relations Act. Arms sales will continue in accordance with the act and with the full expectation that the approach of the Chinese Government to the resolution of the Taiwan issue will continue to be peaceful. We attach great significance to the Chinese statement in the communique regarding China's "fundamental" policy, and it is clear from our statements that our

1040

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LIN, ET. AL, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 06-1825 (RMC) |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**[Proposed] ORDER**

Upon consideration of defendant's Motion to Dismiss and the memorandum of law in support thereof, and responses thereto, it is this _____ day of _____, 2007, hereby ORDERED that defendant's Motion to Dismiss is GRANTED, and this action is DISMISSED WITH PREJUDICE.


_____
Hon. Rosemary M. Collyer
United States District Judge