# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LIN, ET. AL, ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. 06-1825 (RMC) |
| ) | |
| vs. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

## Defendant's Motion to Dismiss

Defendant United States of America, by and through its undersigned counsel, hereby

moves this Court to dismiss this action with prejudice pursuant to Fed. R. Civ. P. 12(b)(1) or, in

the alternative, 12(b)(6) for the reasons set forth in the accompanying Memorandum.


Dated: April 5, 2007

Respectfully submitted,
PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney for the District of Columbia

VINCENT M. GARVEY
Deputy Director, Federal Programs Branch

Of Counsel                              _/s/_____
James G. Hergen (D.C. Bar #116382)      ADAM D. KIRSCHNER
Assistant Legal Adviser for             Trial Attorney
East and South Asian Affairs            U.S. Department of Justice
Office of the Legal Adviser             Civil Division, Federal Programs Branch
U.S. Department of State                Mailing Address
Washington, D.C. 20520                  P.O. Box 883
                                        Washington, D.C., 20044
                                        Delivery Address
                                        20 Massachusetts Ave., NW., Room 7126

Washington, DC 20001
Telephone: (202) 353-9265
Fax: (202) 616-8470
Adam.Kirschner@usdoj.gov

COUNSEL FOR DEFENDANT

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LIN, ET. AL, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 06-1825 (RMC) |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

Plaintiffs, ten individuals who allege that they reside in Taiwan and The Taiwan Nation Party, claim that the individuals were denied rights and privileges as United States nationals. They base their entire claim on the false premise that the United States exercises de jure sovereignty over Taiwan, a premise which implicitly asks this Court to declare that 23 million Taiwanese are nationals of the United States. The political branches have made it clear, however, that the United States does not exercise sovereignty over Taiwan. It is a long standing principle that courts defer to the political branches when there is a question of sovereignty. Because this action presents a non-justiciable political question, this Court lacks subject matter jurisdiction. In bringing this action, plaintiffs also ignore the statutory language that explicitly does not confer nationality status on the Taiwanese people. Therefore, plaintiffs' action seeking a declaration of rights associated with nationality status does not state a claim upon which relief may be granted. Accordingly, this Court should dismiss this action with prejudice.

**BACKGROUND**

## I.     PROCEDURAL HISTORY

On October 24, 2006, plaintiffs filed a complaint against the United States, alleging that the United States is "holding sovereignty over Taiwan."  See Plaintiffs' Complaint ("Compl.") (Dkt. #1) at ¶ 49.  Plaintiffs asked this Court to "determine what fundamental rights, if any, they may have under United States laws."  Id. at ¶ 3.  Defendant filed a motion to dismiss on January 12, 2007.  See Defendant's Motion to Dismiss (Dkt. #6).  After plaintiffs filed their opposition and defendant filed its reply, plaintiffs amended their complaint.  See Plaintiffs' Amended Complaint ("Pl. Am. Compl.").  This Court denied as moot defendant's motion to dismiss the original complaint.  See Minute Order, March 23, 2007.

The amended complaint is brought by ten individuals and the Taiwan Nation Party.  See Pl. Am. Compl.  "Plaintiffs seek a declaration that they have rights and privileges as United States nationals (as opposed to citizens)."  Id. at ¶ 7.  They claim that they are nationals of the United States because the United States is allegedly "holding de jure sovereignty over Taiwan." Id. at ¶ 69.  This complaint is more narrow than their original complaint.  Plaintiffs now allege that they have been denied "rights and privileges as United States nationals."  Id. at ¶ 71. Specifically, they claim that the American Institute of Taiwan ("AIT") "refused to accept and process [their] passport applications" and that this alleged refusal "constituted a denial of their status as United States nationals, and of their rights and privileges as United States nationals."

Id. at ¶¶ 77, 78.  They seek a declaration that the individuals are United States nationals.  Id. at

VII (b) (Relief Requested).[1]

## II.    UNITED STATES' RELATIONS WITH TAIWAN[2]

As a matter of law, the relationship between the United States and Taiwan derives solely

and exclusively from Exec. Order No. 13014 of August 15, 1996, 61 Fed. Reg. 42963

(superseding Exec. Order No. 12143 of June 22, 1979, 44 Fed. Reg. 37191), and the Taiwan

Relations Act of 1979, 22 U.S.C. 3301, et seq.  That intricate relationship does not involve the

United States exercising sovereignty over Taiwan.

Prior to 1979, the United States recognized the government of the Republic of China

("ROC") and considered Taiwan to be part of the ROC, belying plaintiffs' assertion that

"Taiwan has been an occupied territory of the United States" since the end of World War II.  See

Pl. Am. Compl. at ¶ 52.  The Mutual Defense Treaty signed between the United States and the

ROC in 1954 specified that the ROC included the territory of Taiwan.  See Mutual Defense

Treaty, Article VI, Treaties and International Acts Series 3178 (1955) ("the terms 'territorial'

and 'territories' shall mean in respect of the Republic of China, Taiwan and the Pescadores; and

in respect of the United States of America, the inland territories in the West Pacific under its

---

[1]Even if construed more broadly, and plaintiffs are seeking a declaratory judgment that they are entitled to certain "fundamental rights under the United States Constitution and laws," such as those set out in their requests for relief, see Pl. Am. Compl. at ¶ 7, VII (Relief Requested), then for the reasons that defendant stated in its motion to dismiss plaintiffs' original complaint and in its reply to plaintiffs' opposition, this Court lacks jurisdiction and plaintiffs fail to state a claim upon which relief may be granted to bring any such claim.  See Defendant's Motion to Dismiss (Dkt. #6); Defendant's Reply to Plaintiffs' Opposition (Dkt. #12).

[2]For the Court's information, a history of the United States relations with Taiwan is available at the U.S. Department of State's Country Page on China, http://www.state.gov/p/eap/ci/ch/.

jurisdiction"). In 1979, President Carter terminated the Mutual Defense Treaty, see U.S. Department of State Bulletin, Vol. 79 (1979), No. 2023 at 25, but that does not negate the fact that prior to 1979, it was the policy of the United States that the ROC included Taiwan. Significantly, prior to 1979, the United States negotiated with the ROC, in the capacity as sovereign, numerous other international agreements that applied to Taiwan. See generally Treaties in Force (2006) at 361, 362.

On December 30, 1978, President Carter issued a memorandum maintaining that the "United States has announced that on January 1, 1979, it is recognizing the government of the People's Republic of China as the sole legal government of China and is terminating diplomatic relations with the Republic of China." 44 Fed. Reg. 1075. President Carter further stated that the "[e]xisting international agreements and arrangements in force between the United States and Taiwan shall continue in force." Id. (emphasis added). Besides continuing the international agreements that the United States entered into with Taiwan prior to January 1, 1979, President Carter's memorandum stated that "[a]s President of the United States, I have constitutional responsibility for the conduct of the foreign relations of the nation." 44 Fed. Reg. 1075; see also Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 410 (1964) ("[p]olitical recognition [of a government] is exclusively a function of the Executive"). In his memorandum, President Carter also stressed that the "American people will maintain commercial, cultural, and other relations with the people on Taiwan without official government representation and without diplomatic relations." 44 Fed. Reg. 1075. In executive orders in 1979 and 1996, the Executive further spelled out the manner in which the United States is to maintain unofficial relations with the people of Taiwan. See Exec. Order No. 13014 (August 15, 1996); Exec. Order No. 12143 (June

- 4 -

22, 1979).  That 1996 Executive Order also specified that the "[a]greements and arrangements referred to in paragraph (B) of President Carter's memorandum of December 30, 1978, entitled 'Relations With the People on Taiwan' (44 FR 1075) shall, unless otherwise terminated or modified in accordance with law, continue in force."  Exec. Order No. 13104 (August 15, 1996).

Besides issuing executive orders and presidential memorandums concerning the status of Taiwan, the United States also issued a series of joint communiques between 1972 and 1982 with the People's Republic of China ("PRC").  Those communiques included discussion of the status of Taiwan.  In the February 28, 1972, Communique, the United States acknowledged "that all Chinese on either side of the Taiwan Strait maintain there is but one China and that Taiwan is a part of China."  See United States of America-People's Republic of China  Joint Communique of Feb. 27, 1972 [The Shanghai Communique]--U.S. Department of State Bulletin, Vol. 66 (1972), No. 1708, at 435 (attached as Exhibit 1).  In 1979, the two countries issued another Joint Communique regarding the establishment of diplomatic relations between the PRC and the Untied States.  See United States of America-People's Republic of China Joint Communique of January 1, 1979 on Establishment of Diplomatic Relations--U.S. Department of State Bulletin, Vol. 79 (1979), No. 2022, at 25 (attached as Exhibit 2).  In that Communique, the United States again acknowledged the "Chinese position that there is but one China and Taiwan is part of China."  Id.  In a third Communique in 1982, the United States agreed that "[r]espect for each other's sovereignty and territorial integrity and non-interference in each other's internal affairs constitute the fundamental principles guiding United States China relations."  See  United States of America-People's Republic of China Joint Communique of Aug. 17, 1982--Weekly Compilation of Presidential Documents (August 23, 1982), at 1039 (attached as Exhibit 3).  The

United States and the PRC also "agreed that the people of the United States would continue to maintain cultural, commercial, and other unofficial relations with the people of Taiwan."  Id.

The political branches have also charted the United States' relationship with Taiwan through the Taiwan Relations Act of 1979, 48 U.S.C. § 3301, which was passed by Congress and signed into law by the President.  Congress found that the enactment of this statute was "necessary - (1) to help maintain peace, security, and stability in the Western Pacific; and (2) to promote the foreign policy of the United States by authorizing the continuation of commercial, cultural, and other relations between the people of the United States and the people of Taiwan." See 22 U.S.C. § 3301(a).  Furthermore, it declared that the policy of the United States is, inter alia, "to make clear that the United States decision to establish diplomatic relations with the People's Republic of China rests upon the expectation that the future of Taiwan will be determined by peaceful means."  22 U.S.C. § 3301(b)(3).  Congress specifically stated in the Taiwan Relation Act that it approved "the continuation in force of all treaties and other international agreements, including multilateral conventions, entered into by the United States and the governing authorities on Taiwan recognized by the United States as the Republic of China prior to January 1, 1979, and in force between them on December 31, 1978, unless and until terminated in accordance with law."  See 22 U.S.C. § 3303(c) (emphasis added).  The United States now exercises nonofficial relations with Taiwan through the American Institute in Taiwan, a "nonprofit corporation incorporated under the laws of the District of Columbia."  See 22 U.S.C. §§ 3305, 3310a ("[t]he American Institute of Taiwan shall employ personnel to perform duties similar to those performed by personnel of the United States and Foreign Commercial Service.").

## ARGUMENT

### I.    LEGAL STANDARDS

"Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  The Court, of course, "always [has] jurisdiction to determine [its] jurisdiction."  Nestor v. Hershey, 425 F. 2d 504, 511 (D.C. Cir. 1969); accord Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 93-94 (1998) (federal court may not decide merits before determining whether it has jurisdiction over a case).  A Court must accept all of the non-movant's factual allegations as true when reviewing a motion to dismiss under Rule 12(b)(1), but such allegations will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a Rule 12(b)(6) motion for failure to state a claim."  Brady Campaign to Prevent Gun Violence United With the Million Mom March v. Ashcroft, 339 F. Supp. 2d 68, 72-73 (D.D.C. 2004) (internal citation, brackets, and quotation marks omitted).  "A Court may also consider material beyond the allegations in the plaintiff's complaint when determining whether it has subject matter jurisdiction pursuant to Rule 12(b)(1)."  Id. at 73.

A complaint should be dismissed pursuant to Rule 12(b)(6) "if it appears beyond doubt that no set of facts proffered in support of plaintiff's claim would entitle him to relief."  Meng v. Schwartz, 116 F. Supp. 2d 92, 95 (D.D.C. 2000).  In evaluating a Rule 12(b)(6) motion, a court "should presume the allegations to be true and liberally construe them in favor of the plaintiff."  Id.  At the same time, "legal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness," id. (citations and internal quotation marks omitted),

nor are unwarranted inferences drawn by the plaintiffs. See Logan v. Dep't of Veteran Affairs,

357 F. Supp. 2d 149, 153 (D.D.C. 2004); see also Trudeau v. Federal Trade Comm'n, 384 F.

Supp. 2d 281, 288 (D.D.C. Aug. 25, 2005) ("[c]onclusory legal and factual allegations, however,

need not be considered by the court" in deciding a Rule 12(b)(6) motion).

## II.    THIS COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER THIS ACTION

For a lower federal court to have subject matter jurisdiction, the action must present a

case or controversy pursuant to Article III, §2, of the United State Constitution and there must be

a statutory basis for the jurisdiction. See Insurance Corp. of Ireland, LTD. v. Compagnie des

Bauxites de Guniee, 456 US 694, 701-2 (1982) ("[f]ederal courts are courts of limited

jurisdiction. The character of the controversies over which federal judicial authority may extend

are delineated in Article III, § 2, cl. 1. Jurisdiction of the lower federal courts is further limited

to those subjects encompassed within a statutory grant of jurisdiction. Again, this reflects the

constitutional source of federal juridical power: Apart from [the Supreme Court] that power only

exists 'in such inferior Courts as the Congress may from time to time ordain and establish.' Art.

III, § 1.").

"The political question doctrine is one aspect of 'the concept of justiciability, which

expresses the jurisdictional limitations imposed on the federal courts by the 'case or controversy'

requirement' of the Article III of the Constitution." Bancoult v. McNamara, 445 F.3d 427, 432

(D.C. Cir. 2006) (quoting Schlesinger v. Reservists Committee to Stop the War, 418 U.S. at

215). The doctrine is "primarily a function of the separation of powers." Id. (quoting Baker v.

Carr, 369 U.S. 186, 210 (1962)) (quotation marks omitted). It "excludes from judicial review

those controversies which revolve around policy choices and value determinations

- 8 -

constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  Id. (quoting Japan Whaling Ass'n v. Am Cetacean Soc'y, 478 U.S. 221, 230 (1986)) (quotation marks omitted).

The entire basis for plaintiffs' claims that they are nationals of the United States is that the United States is allegedly exercising sovereignty over Taiwan.  See Pl. Am. Compl. at ¶ 69 ("[c]onsidering that the United States is holding de jure sovereignty over Taiwan, the Taiwanese people owe permanent allegiance to the United Sates and have the status of United States nationals (as opposed to citizens)").  However, the determination of who is sovereign of a territory is non-justiciable.  See Jones v. United States, 137 U.S. 202, 212 (1890) ("[w]ho is the sovereign, *de jure* or *de facto*, of a territory, is not a judicial, but a political, question, the determination of which by the legislative and executive of any government conclusively binds the judges, as well as all other officers, citizens, and subjects of that government.  This principle has always been upheld by this court, and has been affirmed under a great variety of circumstances.") (citing cases as far back as 1818) (emphasis in original); Boumediene v. Bush, 476 F.3d 981, 992 (D.C. Cir. 2007) cert. denied, __ S.Ct. __, 2007 WL 957363 (2007) ("[t]he determination of sovereignty over an area, the Supreme Court has held, is for the legislative and executive departments.") (emphasis added) (internal citations omitted).

The "judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory."  Baker, 369 U.S. at 212.  The political branches have made it clear that the United States does not exercise sovereignty over Taiwan and that Taiwan is not a territory subject to the jurisdiction of the United States.  See e.g., Exec. Order No. 13014 (August 15, 1996), 61 Fed. Reg. 13014 ("[i]n light of the recognition of the People's Republic of China by

- 9 -

the United States of America as the sole legal government of China," this Order is to "facilitate

the maintenance of commercial, cultural, and other relations between the people of the United

States and the people on Taiwan without official representation or diplomatic relations"); Taiwan

Relations Act of 1979, 22 U.S.C. § 3301(b)(3) (declaring that the policy of the United States is,

inter alia, "to make clear that the United States decision to establish diplomatic relations with the

People's Republic of China rests upon the expectation that the future of Taiwan will be

determined by peaceful means.").

      This case falls squarely within the criteria that the Supreme Court has identified as

presenting a non-justiciable political question. See Baker, 369 U.S. at 217 (listing the criteria a

court is to use for analyzing whether a cause of action presents a non-justiciable political

question). For this Court to issue a ruling in this case declaring the United States sovereign over

Taiwan - contrary to the explicit position of the political branches that the United States

exercises no sovereign authority over Taiwan - would have the "potentiality of embarrassment

from multifarious pronouncements by various departments on one question." See id. at 217.

This Court would have to make an "initial policy determination of a kind clearly for nonjudicial

discretion" to go beyond the path chosen by the political branches of the government, which

would show a "lack of the respect due coordinate branches of government." See id.

Furthermore, due to the delicate relationship between the United States and the PRC, and the

need to preserve the stability and peace in the Taiwan Strait, there is "an unusual need for

unquestioning adherence to a political decision already made." See id. In addition, it is unclear

what "judicially discoverable and manageable standard" this Court would use in determining the

default status of a territory that was referenced by Douglas MacArthur's General Order dictating

the terms of Japan's surrender at the end of World War II.  See id.; see also Pl. Am. Compl. at ¶ 4 (claiming that MacArthur's order created an "agency relationship" that has not been "altered by any other subsequent legal instrument" "between the principal, the Allied Powers led by the United States, and the agent, the ROC, for the purpose of Taiwan's occupation.").  These issues are directly related to the prominence of a "demonstrable constitutional commitment of [the determination of who is a sovereign of a territory] to a coordinate political department."  See Baker, 369 U.S. at 217.

Resolving the merits of this action would not just intrude on the delicate relationship between the United States and the PRC, but would also "require the court to determine the effects on [] agreements on the rights of [] citizens with respect to events occurring outside the United States."  See Hwang Geum Joo v. Japan, 413 F.3d 45, 51-53 (9th Cir. 2005) (holding that it is a non-justiciable political question to decide "whether the governments of the [plaintiffs in the case] resolved their claims in negotiating peace with Japan" following World War II, because it "would be inimical to the foreign policy interests of the United States" for "a court in the United States to decide whether Korea's or Japan's reading of the treaty between them is correct, when the Executive has determined that choosing between the interests of two foreign states in order to adjudicate a private claim against one of them would adversely affect the foreign relations of the United States") (citation omitted).  For this Court to decide this case, it would need not only to look to the treaties and agreements involving the United States but would also have to interpret the treaty between the ROC and Japan.  See Pl. Am. Compl. at ¶ 48 ("[t]he Treaty of Peace between the ROC, which was signed on April 28, 1952, and entered into force on August 5, 1952 (the 'Treaty of Taipei'), did not transfer sovereignty over Taiwan from Japan

- 11 -

to China"). Given that this case not only presents questions best left to the political branches of the United States but also involves diplomatic relations between other countries, this action should be dismissed because it presents non-justiciable political questions.

## III. PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

Plaintiffs allege that AIT "or its officials denied individual [p]laintiffs' rights and privileges as United States nationals." <u>See</u> Pl. Am. Compl. at ¶ 71. It appears that this claim is brought under the Immigration Nationality Act ("INA") § 360, 8 U.S.C. § 1503, which allows an individual to bring a declaratory judgment action if a person claims to be United States national and is denied "such right or privilege . . . upon the ground that he is not a national of the United States." <u>See</u> 8 U.S.C. §§ 1503. However, plaintiffs have failed to state a claim under this statute because their entire basis for asking this Court to declare that they are nationals of the United States is that they reside in Taiwan. <u>See</u> Plaintiffs' Amended Complaint ("Pl. Am. Compl.") at ¶ 69 ("the Taiwanese people owe permanent allegiance to the United States and have the status of United States nationals (as opposed to citizens)"). But plaintiffs are not nationals of the United States. The mere fact that they are from Taiwan does not meet the statutory definition of nationality upon which they are relying because their claim is based on the faulty premise that the "United States is holding de jure sovereignty over Taiwan." <u>See</u> <u>id</u>. In charting the United States relations with Taiwan, the political branches have repudiated plaintiffs' claim that the United States is sovereign over Taiwan. Therefore, plaintiffs do not state a claim upon which relief may be granted because they could not have been denied rights and privileges as United States nationals if they are not United States nationals.

- 12 -

Merely being from Taiwan does not meet the statutory definition of who is considered a national of the United States.  The statute explicitly states that "[t]he term 'national of the United States' means (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States."  See 8 U.S.C. § 1101(a)(22). Plaintiffs are not alleging that they are citizens, so their entire basis for claiming nationality status is 8 U.S.C. § 1101(a)(22)(B).  See Pl. Am. Compl. at ¶¶ 7, 69 (claiming that they are "nationals (as opposed to citizens)").  Plaintiffs' manifestation that the "Taiwanese people owe permanent allegiance to the United States," see Pl. Am. Compl. at ¶ 69, is not sufficient for them to fall under that statutory provision.  See Marquez-Almanzar v. INS, 418 F.3d 210, 218-219 (2nd Cir. 2005) (holding that "one cannot qualify as a U.S. national under 8 U.S.C. § 1101(a)(22)(B) by a manifestation of 'permanent allegiance' to the United States"); see also Abur v. Republic of Sudan, 437 F. Supp. 2d 166, 176-77 (D.D.C. 2006) (discussing different Circuit opinions). Rather, that provision must be "read in the context of the general statutory scheme" and "the only 'non-citizen nationals' currently recognized by our law are persons deemed to be so under 8 U.S.C. § 1408."  Marquez-Almanzar, 418 F.3d at 217, 219.

The individual plaintiffs have failed to state a claim that they meet the criteria under 8 U.S.C. § 1408 for being considered United States non-citizen nationals.  Section 1408 defines a non-citizen national as a "person born in an outlying possession of the United States on or after the date of the formal acquisition of such possession."  See 8 U.S.C. § 1408(1).[3]  But, Taiwan is

---

[3]Section 1408 defines three other situations for a person to be considered a non-citizen national, but plaintiffs are not making any allegations related to those situations.  Plaintiffs have not alleged that their parents are nationals and have residences in the United States, see 8 U.S.C. § 1408(2), that they are of an unknown parentage found in an outlying possession of the United States while under the age of five, 8 U.S.C. § 1408(3), or that one of each of their parents are

not an outlying possession of the United States.  The statute defines "outlying possessions of the United States" as being "American Samoa and Swains Island."  <u>See</u> 8 U.S.C. § 1101(a)(29); <u>see also</u> <u>Miller v. Albright</u>, 523 U.S. 420, 467 n.2 (1998) (Ginsburg, J., dissenting) ("[n]ationality and citizenship are not entirely synonymous; one can be a national of the United States and yet not a citizen.  8 U.S.C. § 1101(a)(22).  The distinction has little practical impact today, however, for the <u>only remaining noncitizen nationals are residents of American Samoa and Swains Island</u>.") (emphasis added); <u>Abur v. Republic of Sudan</u>, 437 F. Supp. 2d at 176-77.  Considering that plaintiffs are not nationals by virtue of being from Taiwan, plaintiffs have failed to state a claim upon which relief may be granted because they are not entitled to rights or privileges as United States nationals.

Besides it being clear from the statute that Taiwan is not considered an outlying possession of the United States, the political branches have also made it clear that the United States does not exercise sovereignty over Taiwan.  <u>See</u>, <u>supra</u>, at 8-12.  This alleged sovereignty by the United States over Taiwan is the foundation for plaintiffs' claim that they are United States nationals.  <u>See</u> Pl. Am. Compl. at ¶ 69 ("[c]onsidering that the United States is holding de jure sovereignty over Taiwan, the Taiwanese people owe permanent allegiance to the United States and have the status of United Sates nationals (as opposed to citizens)").  Because plaintiffs cannot claim they are nationals of the United States merely because they are from Taiwan, plaintiffs have failed to state a claim under the INA § 360, 5 U.S.C. §§ 1503.

---

nationals of the United States and who were present in the United States for at least seven years during a "continuous period of ten years," <u>see</u> 8 U.S.C. § 1408(4).  Rather, they have alleged that they are entitled to nationality status because of their claim that the "United States is holding sovereignty over Taiwan."  <u>See</u> Pl. Am. Compl. at ¶ 69.

# CONCLUSION

For the reasons stated above, defendant respectfully requests this Court to grant its motion to dismiss.

Dated: April 5, 2007

Respectfully submitted,
PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney for the District of Columbia

VINCENT M. GARVEY
Deputy Director, Federal Programs Branch

Of Counsel
James G. Hergen (D.C. Bar #116382)
Assistant Legal Adviser for
East and South Asian Affairs
Office of the Legal Adviser
U.S. Department of State
Washington, D.C. 20520

 _/s/_____
ADAM D. KIRSCHNER
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
Mailing Address
P.O. Box 883
Washington, D.C., 20044
Delivery Address
20 Massachusetts Ave., NW., Room 7126
Washington, DC 20001
Telephone: (202) 353-9265
Fax: (202) 616-8470
Adam.Kirschner@usdoj.gov

COUNSEL FOR DEFENDANT

rules of international conduct which will reduce the risk of confrontation and war in Asia and in the Pacific.

We agreed that we are opposed to domination of the Pacific area by any one power. We agreed that international disputes should be settled without the use of the threat of force and we agreed that we are prepared to apply this principle to our mutual relations.

With respect to Taiwan, we stated our established policy that our forces overseas will be reduced gradually as tensions ease, and that our ultimate objective is to withdraw our forces as a peaceful settlement is achieved.

We have agreed that we will not negotiate the fate of other nations behind their backs, and we did not do so at Peking. There were no secret deals of any kind. We have done all this without giving up any United States commitment to any other country.

In our talks, the talks that I had with the leaders of the People's Republic and that the Secretary of State had with the office of the Government of the People's Republic in the foreign affairs area, we both realized that a bridge of understanding that spans almost 12,000 miles and 22 years of hostility can't be built in 1 week of discussions. But we have agreed to begin to build that bridge, recognizing that our work will require years of patient effort. We made no attempt to pretend that major differences did not exist between our two governments, because they do exist.

This communique was unique in honestly setting forth differences rather than trying to cover them up with diplomatic doubletalk.

One of the gifts that we left behind in Hangchow was a planted sapling of the American redwood tree. As all Californians know, and as most Americans know, redwoods grow from saplings into the giants of the forest. But the process is not one of days or even years; it is a process of centuries.

Just as we hope that those saplings, those tiny saplings that we left in China, will grow one day into mighty redwoods, so we hope, too, that the seeds planted on this journey for peace will grow and prosper into a more enduring structure for peace and security in the Western Pacific.

But peace is too urgent to wait for centuries. We must seize the moment to move toward that goal now, and this is what we have done on this journey.

As I am sure you realize, it was a great experience for us to see the timeless wonders of ancient China, the changes that are being made in modern China. And one fact stands out, among many others, from my talks with the Chinese leaders. It is their total belief, their total dedication, to their system of government. That is their right, just as it is the right of any country to choose the kind of government it wants.

But as I return from this trip, just as has been the case on my return from other trips abroad which have taken me to over 80 countries, I come back to America with an even stronger faith in our system of government.

As I flew across America today, all the way from Alaska, over the Rockies, the Plains, and then on to Washington, I thought of the greatness of our country and, most of all, I thought of the freedom, the opportunity, the progress that 200 million Americans are privileged to enjoy. I realized again this is a beautiful country. And tonight my prayer and my hope is that as a result of this trip, our children will have a better chance to grow up in a peaceful world.

Thank you.

## TEXT OF JOINT COMMUNIQUE, ISSUED AT SHANGHAI, FEBRUARY 27

President Richard Nixon of the United States of America visited the People's Republic of China at the invitation of Premier Chou En-lai of the People's Republic of China from February 21 to February 28, 1972. Accompanying the President were Mrs. Nixon, U.S. Secretary of State William Rogers, Assistant to the President Dr. Henry Kissinger, and other American officials.

President Nixon met with Chairman Mao

HeinOnline -- 66 Dep't St. Bull. 435 1972

Tse-tung of the Communist Party of China on February 21. The two leaders had a serious and frank exchange of views on Sino-U.S. relations and world affairs.

During the visit, extensive, earnest and frank discussions were held between President Nixon and Premier Chou En-lai on the normalization of relations between the United States of America and the People's Republic of China, as well as on other matters of interest to both sides. In addition, Secretary of State William Rogers and Foreign Minister Chi Peng-fei held talks in the same spirit.

President Nixon and his party visited Peking and viewed cultural, industrial and agricultural sites, and they also toured Hangchow and Shanghai where, continuing discussions with Chinese leaders, they viewed similar places of interest.

The leaders of the People's Republic of China and the United States of America found it beneficial to have this opportunity, after so many years without contact, to present candidly to one another their views on a variety of issues. They reviewed the international situation in which important changes and great upheavals are taking place and expounded their respective positions and attitudes.

The U.S. side stated: Peace in Asia and peace in the world requires efforts both to reduce immediate tensions and to eliminate the basic causes of conflict. The United States will work for a just and secure peace: just, because it fulfills the aspirations of peoples and nations for freedom and progress; secure, because it removes the danger of foreign aggression. The United States supports individual freedom and social progress for all the peoples of the world, free of outside pressure or intervention. The United States believes that the effort to reduce tensions is served by improving communication between countries that have different ideologies so as to lessen the risks of confrontation through accident, miscalculation or misunderstanding. Countries should treat each other with mutual respect and be willing to compete peacefully, letting per-

formance be the ultimate judge. No country should claim infallibility and each country should be prepared to re-examine its own attitudes for the common good. The United States stressed that the peoples of Indochina should be allowed to determine their destiny without outside intervention; its constant primary objective has been a negotiated solution; the eight-point proposal put forward by the Republic of Vietnam and the United States on January 27, 1972 represents a basis for the attainment of that objective; in the absence of a negotiated settlement the United States envisages the ultimate withdrawal of all U.S. forces from the region consistent with the aim of self-determination for each country of Indochina. The United States will maintain its close ties with and support for the Republic of Korea; the United States will support efforts of the Republic of Korea to seek a relaxation of tension and increased communication in the Korean peninsula. The United States places the highest value on its friendly relations with Japan; it will continue to develop the existing close bonds. Consistent with the United Nations Security Council Resolution of December 21, 1971, the United States favors the continuation of the ceasefire between India and Pakistan and the withdrawal of all military forces to within their own territories and to their own sides of the ceasefire line in Jammu and Kashmir; the United States supports the right of the peoples of South Asia to shape their own future in peace, free of military threat, and without having the area become the subject of great power rivalry.

The Chinese side stated: Wherever there is oppression, there is resistance. Countries want independence, nations want liberation and the people want revolution—this has become the irresistible trend of history. All nations, big or small, should be equal; big nations should not bully the small and strong nations should not bully the weak. China will never be a superpower and it opposes hegemony and power politics of any kind. The Chinese side stated that it firmly supports the struggles of all the oppressed people and nations for freedom and liberation and that the people of all countries have the right to

choose their social systems according to their own wishes and the right to safeguard the independence, sovereignty and territorial integrity of their own countries and oppose foreign aggression, interference, control and subversion. All foreign troops should be withdrawn to their own countries.

The Chinese side expressed its firm support to the peoples of Vietnam, Laos and Cambodia in their efforts for the attainment of their goal and its firm support to the seven-point proposal of the Provisional Revolutionary Government of the Republic of South Vietnam and the elaboration of February this year on the two key problems in the proposal, and to the Joint Declaration of the Summit Conference of the Indochinese Peoples. It firmly supports the eight-point program for the peaceful unification of Korea put forward by the Government of the Democratic People's Republic of Korea on April 12, 1971, and the stand for the abolition of the "U.N. Commission for the Unification and Rehabilitation of Korea." It firmly opposes the revival and outward expansion of Japanese militarism and firmly supports the Japanese people's desire to build an independent, democratic, peaceful and neutral Japan. It firmly maintains that India and Pakistan should, in accordance with the United Nations resolutions on the India-Pakistan question, immediately withdraw all their forces to their respective territories and to their own sides of the ceasefire line in Jammu and Kashmir and firmly supports the Pakistan Government and people in their struggle to preserve their independence and sovereignty and the people of Jammu and Kashmir in their struggle for the right of self-determination.

There are essential differences between China and the United States in their social systems and foreign policies. However, the two sides agreed that countries, regardless of their social systems, should conduct their relations on the principles of respect for the sovereignty and territorial integrity of all states, non-aggression against other states, non-interference in the internal affairs of other states, equality and mutual benefit, and peaceful coexistence. International disputes should be settled on this basis, without resorting to the use or threat of force. The United States and the People's Republic of China are prepared to apply these principles to their mutual relations.

With these principles of international relations in mind the two sides stated that:

—progress toward the normalization of relations between China and the United States is in the interests of all countries;

—both wish to reduce the danger of international military conflict;

—neither should seek hegemony in the Asia-Pacific region and each is opposed to efforts by any other country or group of countries to establish such hegemony; and

—neither is prepared to negotiate on behalf of any third party or to enter into agreements or understandings with the other directed at other states.

Both sides are of the view that it would be against the interests of the peoples of the world for any major country to collude with another against other countries, or for major countries to divide up the world into spheres of interest.

The two sides reviewed the long-standing serious disputes between China and the United States. The Chinese side reaffirmed its position: The Taiwan question is the crucial question obstructing the normalization of relations between China and the United States; the Government of the People's Republic of China is the sole legal government of China; Taiwan is a province of China which has long been returned to the motherland; the liberation of Taiwan is China's internal affair in which no other country has the right to interfere; and all U.S. forces and military installations must be withdrawn from Taiwan. The Chinese Government firmly opposes any activities which aim at the creation of "one China, one Taiwan," "one China, two governments," "two Chinas," and "independent Taiwan" or advocate that "the status of Taiwan remains to be determined."

The U.S. side declared: The United States acknowledges that all Chinese on either side

HeinOnline -- 66 Dep't St. Bull. 437 1972

of the Taiwan Strait maintain there is but one China and that Taiwan is a part of China. The United States Government does not challenge that position. It reaffirms its interest in a peaceful settlement of the Taiwan question by the Chinese themselves. With this prospect in mind, it affirms the ultimate objective of the withdrawal of all U.S. forces and military installations from Taiwan. In the meantime, it will progressively reduce its forces and military installations on Taiwan as the tension in the area diminishes.

The two sides agreed that it is desirable to broaden the understanding between the two peoples. To this end, they discussed specific areas in such fields as science, technology, culture, sports and journalism, in which people-to-people contacts and exchanges would be mutually beneficial. Each side undertakes to facilitate the further development of such contacts and exchanges.

Both sides view bilateral trade as another area from which mutual benefit can be derived, and agreed that economic relations based on equality and mutual benefit are in the interest of the peoples of the two countries. They agree to facilitate the progressive development of trade between their two countries.

The two sides agreed that they will stay in contact through various channels, including the sending of a senior U.S. representative to Peking from time to time for concrete consultations to further the normalization of relations between the two countries and continue to exchange views on issues of common interest.

The two sides expressed the hope that the gains achieved during this visit would open up new prospects for the relations between the two countries. They believe that the normalization of relations between the two countries is not only in the interest of the Chinese and American peoples but also contributes to the relaxation of tension in Asia and the world.

President Nixon, Mrs. Nixon and the American party expressed their appreciation for the gracious hospitality shown them by the Government and people of the People's Republic of China.

## CHRONOLOGY OF EVENTS

Weekly Compilation of Presidential Documents dated February 28

*Thursday, February 17*

After a departure ceremony on the South Lawn of the White House, the President went by helicopter to Andrews Air Force Base for the flight to Hawaii, en route to the People's Republic of China.

Arriving at Kaneohe Marine Corps Air Station, Oahu, Hawaii, the President and Mrs. Nixon motored to the residence of the Commanding General, First Marine Brigade, where they remained until Saturday afternoon, February 19, reading and preparing for the China visit.

*Saturday, February 19–Sunday, February 20*

The President and Mrs. Nixon boarded the Spirit of '76 at Kaneohe Marine Corps Air Station for the 8-hour flight to Guam. Crossing the international date line en route, they arrived at Guam International Airport shortly after 5 p.m. on Sunday, February 20, Guam time. They spent the night at Nimitz Hill, the residence of the Commander, Naval Forces, Marianas.

*Monday, February 21*

At 7 a.m. Guam time, the President and Mrs. Nixon left Guam International Airport for Shanghai, their first stop in the People's Republic of China. They arrived, after a 4-hour flight, at Hung Chiao (Rainbow Bridge) Airport, Shanghai, at 9 a.m., China time, where they were greeted by officials of the People's Republic, headed by Vice Minister of Foreign Affairs Chiao Kuan-hua. After refreshments and a tour of the terminal, the Presidential party again boarded the Spirit of '76, accompanied by Vice Minister Chiao, Chang Wen-chin and Wang Hai-jung of the Foreign Ministry, a Chinese navigator, radio operator, and three interpreters, for the final leg of the flight to Peking.

At about 11:30 a.m., China time, the party arrived at Capital Airport near Peking. Premier Chou En-lai greeted the President and members of his party, stood with the President for the playing of the national anthems of the two countries, and accompanied the President in a review of the troops.

The Premier then accompanied the President in a motorcade to Peking, to Taio Yu Tai (Angling Terrace), the guesthouse where the President and Mrs. Nixon would stay during their visit.

In the afternoon, the President met for an hour

HeinOnline -- 66 Dep't St. Bull. 438 1972

# EAST ASIA:    *U.S. Normalizes Relations With the People's Republic of China*

*Following are the texts of December 15, 1978, of the joint communique between the United States and the People's Republic of China, President Carter's address to the nation and remarks to reporters following the address, and the U.S. statement on normalization.[1]*

## PRESIDENT'S ADDRESS [2]

I would like to read a joint communique which is being simultaneously issued in Peking at this very moment by the leaders of the People's Republic of China.

[At this point, the President read the text of the joint communique.]

Yesterday, our country and the People's Republic of China reached this final historic agreement. On January 1, 1979, a little more than 2 weeks from now, our two governments will implement full normalization of diplomatic relations.

As a nation of gifted people who comprise about one-fourth of the total population of the Earth, China plays, already, an important role in world affairs, a role that can only grow more important in the years ahead.

We do not undertake this important step for transient tactical or expedient reasons. In recognizing the People's Republic of China, that it is the single Government of China, we are recognizing simple reality. But far more is involved in this decision than just the recognition of a fact.

Before the estrangement of recent decades, the American and the Chinese people had a long history of friendship. We've already begun to rebuild some of those previous ties. Now our rapidly expanding relationship requires the kind of structure that only full diplomatic relations will make possible.

The change that I'm announcing tonight will be of great long-term benefit to the peoples of both our country and China—and, I believe, to all the peoples of the world. Normalization—and the expanded commercial and cultural relations that it will bring—will contribute to the well-being of our own nation, to our own national interest, and it will also enhance the stability of Asia. These more positive relations with China can beneficially affect the world in which we live and the world

in which our children will live.

We have already begun to inform our allies and other nations and the Members of the Congress of the details of our intended action. But I wish also tonight to convey a special message to the people of Taiwan—I have already communicated with the leaders in Taiwan—with whom the American people have had and will have extensive, close, and friendly relations. This is important between our two peoples.

As the United States asserted in the Shanghai communique of 1972,[3] issued on President Nixon's historic visit, we will continue to have an interest in the peaceful resolution of the Taiwan issue. I have paid special attention to insuring that normalization of relations between our country and the People's Republic will not jeopardize the well-being of the people of Taiwan. The people of our country will maintain our current commercial, cultural, trade, and other relations with Taiwan through nongovernmental means. Many other countries in the world are already successfully doing this.

These decisions and these actions open a new and important chapter in our country's history and also in world affairs.

To strengthen and to expedite the benefits of this new relationship between China and the United States, I am pleased to announce that Vice Premier Teng has accepted my invitation and will visit Washington at the end of January. His visit will give our governments the opportunity to consult with each other on global issues and to begin working together to enhance the cause of world peace.

These events are the final result of long and serious negotiations begun by President Nixon in 1972 and continued under the leadership of President Ford. The results bear witness to the steady, determined, bipartisan effort of our own country to build a world in which peace will be the goal and the responsibility of all nations.

The normalization of relations between the United States and China has no other purpose than this: the advancement of peace. It is in this spirit, at this season of peace, that I take special pride in sharing this good news with you tonight.

## PRESIDENT'S REMARKS [4]

I wanted to come by and let you know that I believe this to be an extremely important moment in the history of our nation. It's something that I and my two predecessors have sought

---

### JOINT COMMUNIQUE, DEC. 15

JOINT COMMUNIQUE ON THE ESTABLISHMENT OF DIPLOMATIC RELATIONS BETWEEN THE UNITED STATES OF AMERICA AND THE PEOPLE'S REPUBLIC OF CHINA
JANUARY 1, 1979

The United States of America and the People's Republic of China have agreed to recognize each other and to establish diplomatic relations as of January 1, 1979.

The United States of America recognizes the Government of the People's Republic of China as the sole legal Government of China. Within this context, the people of the United States will maintain cultural, commercial, and other unofficial relations with the people of Taiwan.

The United States of America and the People's Republic of China reaffirm the principles agreed on by the two sides in the Shanghai Communique and emphasize once again that:

• Both wish to reduce the danger of international military conflict.

• Neither should seek hegemony in the Asia-Pacific region or in any other region of the world and each is opposed to efforts by any other country or group of countries to establish such hegemony.

• Neither is prepared to negotiate on behalf of any third party or to enter into agreements or understandings with the other directed at other states.

• The Government of the United States of America acknowledges the Chinese position that there is but one China and Taiwan is part of China.

• Both believe that normalization of Sino-American relations is not only in the interest of the Chinese and American peoples but also contributes to the cause of peace in Asia and the world.

The United States of America and the People's Republic of China will exchange Ambassadors and establish Embassies on March 1, 1979.

---

which offers hope for millions of Americans at home, on the farm, and in the workplace?

Do we tell these Americans to give up hope, that their ship of state lies dead in the water because those entrusted with manning that ship can't agree on which sail to raise? We're within sight of the safe port of economic recovery. Do we make port or go aground on the shoals of selfishness, partisanship, and just plain bullheadedness?

The measure the Congress is about to vote on, while not perfect in the eyes of any one of us, will bring us closer to the goal of a balanced budget, restored industrial power, and employment for all who want to work. Together we can reach that goal.

Thank you. God bless you.

*Note: The President spoke at 8:02 p.m. from the Oval Office at the White House. The address was broadcast live on nationwide radio and television.*

## United States Arms Sales to Taiwan

*Joint Communique of the United States and the People's Republic of China.*
*August 17, 1982*

1. In the Joint Communique on the Establishment of Diplomatic Relations on January 1, 1979, issued by the Government of the United States of America and the Government of the People's Republic of China, the United States of America recognized the Government of the People's Republic of China as the sole legal government of China, and it acknowledged the Chinese position that there is but one China and Taiwan is part of China. Within that context, the two sides agreed that the people of the United States would continue to maintain cultural, commercial, and other unofficial relations with the people of Taiwan. On this basis, relations between the United States and China were normalized.

2. The question of United States arms sales to Taiwan was not settled in the course of negotiations between the two countries on establishing diplomatic relations. The two sides held differing positions, and the Chinese side stated that it would raise the issue again following normalization. Recognizing that this issue would seriously hamper the development of United States-China relations, they have held further discussions on it, during and since the meetings between President Ronald Reagan and Premier Zhao Ziyang and between Secretary of State Alexander M. Haig, Jr., and Vice Premier and Foreign Minister Huang Hua in October, 1981.

3. Respect for each other's sovereignty and territorial integrity and non-interference in each other's internal affairs constitute the fundamental principles guiding United States-China relations. These principles were confirmed in the Shanghai Communique of February 28, 1972, and reaffirmed in the Joint Communique on the Establishment of Diplomatic Relations which came into effect on January 1, 1979. Both sides emphatically state that these principles continue to govern all aspects of their relations.

4. The Chinese government reiterates that the question of Taiwan is China's internal affair. The Message to Compatriots in Taiwan issued by China on January 1, 1979, promulgated a fundamental policy of striving for peaceful reunification of the Motherland. The Nine-Point Proposal put forward by China on September 30, 1981, represented a further major effort under this fundamental policy to strive for a peaceful solution to the Taiwan question.

5. The United States Government attaches great importance to its relations with China, and reiterates that it has no intention of infringing on Chinese sovereignty and territorial integrity, or interfering in China's internal affairs, or pursing a policy of "Two Chinas" or "one China, one Taiwan." The United States Government understands and appreciates the Chinese policy of striving for a peaceful resolution of the Taiwan question as indicated in China's Message to Compatriots in Taiwan issued on January 1, 1979, and the Nine-Point Proposal put forward by China on September 30,

1039

*Aug. 17 / Administration of Ronald Reagan, 1982*

1981. The new situation which has emerged with regard to the Taiwan question also provides favorable conditions for the settlement of United States-China differences over the question of United States arms sales to Taiwan.

6. Having in mind the foregoing statements of both sides, the United States Government states that it does not seek to carry out a long-term policy of arms sales to Taiwan, that its arms sales to Taiwan will not exceed, either in qualitative or in quantitative terms, the level of those supplied in recent years since the establishment of diplomatic relations between the United States and China, and that it intends to reduce gradually its sales or arms to Taiwan, leading over a period of time to a final resolution. In so stating, the United States acknowledges China's consistent position regarding the thorough settlement of this issue.

7. In order to bring about, over a period of time, a final settlement of the question of United States arms sales to Taiwan, which is an issue rooted in history, the two governments will make every effort to adopt measures and create conditions conducive to the thorough settlement of this issue.

8. The development of United States-China relations is not only in the interests of the two peoples but also conducive to peace and stability in the world. The two sides are determined, on the principle of equality and mutual benefit, to strengthen their ties in the economic, cultural, educational, scientific, technological and other fields and make strong, joint efforts for the continued development of relations between the governments and peoples of the United States and China.

9. In order to bring about the healthy development of United States-China relations, maintain world peace and oppose aggression and expansion, the two governments reaffirm the principles agreed on by the two sides in the Shanghai Communique and the Joint Communique on the Establishment of Diplomatic Relations. The two sides will maintain contact and hold appropriate consultations on bilateral and international issues of common interest.

## United States Arms Sales to Taiwan

*Statement by the President.*
*August 17, 1982*

The U.S.-China joint communique issued today embodies a mutually satisfactory means of dealing with the historical question of U.S. arms sales to Taiwan. This document preserves principles on both sides and will promote the further development of friendly relations between the governments and peoples of the United States and China. It will also contribute to the further reduction of tensions and to lasting peace in the Asia/Pacific region.

Building a strong and lasting relationship with China has been an important foreign policy goal of four consecutive American administrations. Such a relationship is vital to our long-term national security interests and contributes to stability in East Asia. It is in the national interest of the United States that this important strategic relationship be advanced. This communique will make that possible, consistent with our obligations to the people of Taiwan.

In working toward this successful outcome we have paid particular attention to the needs and interests of the people of Taiwan. My longstanding personal friendship and deep concern for their well-being is steadfast and unchanged. I am committed to maintaining the full range of contacts between the people of the United States and the people of Taiwan—cultural, commercial, and people-to-people contacts—which are compatible with our unofficial relationship. Such contacts will continue to grow and prosper and will be conducted with the dignity and honor befitting old friends.

Regarding future U.S. arms sales to Taiwan, our policy, set forth clearly in the communique, is fully consistent with the Taiwan Relations Act. Arms sales will continue in accordance with the act and with the full expectation that the approach of the Chinese Government to the resolution of the Taiwan issue will continue to be peaceful. We attach great significance to the Chinese statement in the communique regarding China's "fundamental" policy, and it is clear from our statements that our

1040

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
LIN, ET. AL,                                                )
                                                            )
                          Plaintiffs,                       )        Civil Action No. 06-1825 (RMC)
                                                            )
              vs.                                           )
                                                            )
UNITED STATES OF AMERICA,                                   )
                                                            )
                          Defendant.                        )
_____)

## [Proposed] ORDER

  Upon consideration of defendant's Motion to Dismiss and the memorandum of law in support thereof, and responses thereto, it is this _____ day of _____, 2007, hereby ORDERED that defendant's Motion to Dismiss is GRANTED, and this action is DISMISSED WITH PREJUDICE.

            _____
            Hon. Rosemary M. Collyer
            United States District Judge