## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DR. ROGER C. S. LIN, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-1825 (RMC) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Charles H. Camp (D.C. Bar # 413575)
LAW OFFICES OF CHARLES H. CAMP
1725 Eye Street, N.W., Suite 300
Washington, D.C. 20006
Telephone: (202) 349-3905
Facsimile: (202) 349-3906
Email:  ccamp@charlescamplaw.com

**Counsel for Plaintiffs**

April 19, 2007

## TABLE OF CONTENTS

INTRODUCTION………………....…………………………………………………………1

ARGUMENT………………………………………………………………………………..4

    I.  THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THE
        ACTION………………………………………………………………………......4

        A.  This Case Does Not Present a Non-Justiciable Political Question………………5

            1.  The *Baker/Goldwater* standard for determining whether
               a case presents a nonjusticiable political question……………………………5

            2.  Not all cases involving foreign relations present "political questions."………6

            3.  There is no "textually demonstrable" "commitment"
               of the question presented by Plaintiffs to the political branches……………..9

            4.  There is no "lack of judicially discoverable and manageable
               standards" or "impossibility of deciding without an initial
               policy determination."………………………………………………………10

            5.  Judicial resolution of this case would not contradict any
               prior policy determination by the political branches and
               would not interfere with their conduct of foreign relations…………………11

        B.  This Court Has Jurisdiction Authorized by Statutes……………………………18

    II.  PLAINTIFFS STATE A CLAIM UPON WHICH RELIEF CAN BE
       GRANTED…………………………………………………………………………18

        A.  Plaintiffs Are United States Nationals Because They Owe
            Permanent Allegiance to the United States………………………………………19

        B.  The INA § 308, 8 U.S.C. § 1408 Does Not Provide an Exhaustive
            List of Ways To Acquire United States Nationality………………………………21

        C.  The INA Does Not Provide an Exhaustive List of Territories Subject
            to *De Jure* Sovereignty of the United States………………………………………22

CONCLUSION…………………………………………………………………….............23

## INTRODUCTION

Mischaracterizing the Amended Complaint, Defendant contends that Plaintiffs are asking the Court to adopt a "false premise" as to what country exercises *de jure* sovereignty over Taiwan. (Memo. Def.'s Mot. to Dismiss at 1.) Instead, Plaintiffs are requesting the Court to interpret treaties, statutes, and other legislative and executive pronouncements to determine Plaintiffs' rights. Indeed, nowhere in the Amended Complaint are Plaintiffs asking the Court to contradict or depart from any prior policy determinations by the political branches concerning Taiwan's status. Ample authorities, including *Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962), demonstrate that such exercise of the judicial power is consistent with the political question doctrine.

Defendant contends that the "political branches have made it clear" what country exercises (or does not exercise) *de jure* sovereignty over Taiwan. If that is the case, the Court certainly will not exceed the bounds of its judicial authority by adjudicating the case on the merits and declaring to what extent the Immigration and Nationality Act ("INA"),[1] the Administrative Procedure Act ("APA"),[2] and the United States Constitution apply to Plaintiffs. If, on the other hand, the treaties, statutes, and other legislative and executive pronouncements regarding Taiwan's status are unclear, it is nonetheless the Court's Constitutional power and duty to interpret them and to declare to what extent United States laws and the Constitution guarantee Plaintiffs' rights.

---

[1]    Immigration and Nationality Act, 8 U.S.C. § 1101-1778 (2007) (hereinafter "INA").

[2]    Administrative Procedure Act, 5 U.S.C. §§ 701-706 (2007) (hereinafter "APA").

Entirely neglecting to even mention the San Francisco Peace Treaty ("SFPT"),[3] Defendant takes the erroneous position that "the relationship between the United States and Taiwan derives *solely* and *exclusively* from [Executive] Order No. 13014"[4] and "the Taiwan Relations Act."[5] (Memo. Def.'s Mot. to Dismiss at 3 (emphasis added).) The SFPT, however, is the supreme law of the land and the highest ranking legal instrument defining the status of Taiwan *vis-à-vis* the United States, the "principal occupying Power."[6] Pursuant to the SFPT, Japan renounced *de jure* sovereignty over Taiwan, and the sovereignty was not vested in any other state.[7] Since the SFPT, as a matter of undisputed law, the United States has been and remains the "principal occupying Power" in Taiwan.[8]

Importantly, no other legal instrument has ever changed Taiwan's status *vis-à-vis* the United States. Defendant misconstrues the ramifications of the 1954 Mutual Defense Treaty ("MDT"),[9] suggesting that by entering into the MDT with the Republic of China ("ROC"), the United States "recognized the government of the [ROC] and considered Taiwan to be part of the ROC." (Memo. Def.'s Mot. to Dismiss at 3.) In view of the Unites States Senate's Committee on Foreign Relations, however, the MDT did not modify or affect the existing legal status of

---

[3]    Treaty of Peace with Japan, Sept. 8, 1951, Allied Powers-Japan, 3 U.S.T. 3169 (hereinafter "SFPT").

[4]    Executive Order No. 13014, 61 Fed. Reg. 42063 (August 15, 1996).

[5]    Taiwan Relations Act, 22 U.S.C. §§ 3301-3316 (2006) (hereinafter "TRA").

[6]    SFPT, art. 23(a).

[7]    SFPT, art. 2(b).

[8]    SFPT, art. 23(a).

[9]    Mutual Defense Treaty, Dec. 2, 1954, U.S.-ROC, 6 U.S.T. 433, TIAS No. 3178, 248 UNTS 213 (terminated January 1, 1980) (hereinafter "MDT").

Taiwan. The Committee specified, "nothing in the [] treaty shall be construed as affecting or modifying the legal status or sovereignty of the territories referred to in the [treaty,]" namely Taiwan.[10]

President Carter's Memorandum of December 30, 1979, entitled "Relations With the People on Taiwan" did not affect the status of Taiwan. Defendant concedes that President Carter stressed in his Memorandum that the "American people will maintain commercial, cultural, and other relations with the people on Taiwan without official government representation and without diplomatic relations."[11] (Memo. Def's Mot. to Dismiss at 4.)

Likewise, the 1979 Taiwan Relations Act ("TRA") did not alter the "absence of diplomatic relations and recognition . . . with respect to Taiwan."[12] The TRA merely authorized "the continuation of commercial, cultural, and other relations between the people of the United States and the people of Taiwan."[13]

The Joint Communiqués between 1972 and 1982 did not affect the status of Taiwan as an occupied territory of the United States. In the February 27, 1972, Joint Communiqué, the United States merely acknowledged the People's Republic of China's ("PRC") position regarding Taiwan's status and did not challenge that position.[14] "The U.S. side stated" that it "envisages the ultimate withdrawal of all U.S. forces from the region consistent with the aim of self-

---

[10]    101 Cong. Rec. 1379, 1381 (1955).

[11]    President Carter's Memorandum, 44 Fed. Reg. 1075 (December 30, 1978).

[12]    TRA, 22 U.S.C. § 3303(a).

[13]    TRA, 22 U.S.C. § 3301(a).

[14]    Joint Communiqué, 66 Dep't St. Bull. 437-438 (1972).

determination for each country of Indochina."[15]   The United States affirmed "the ultimate objective of the withdrawal of the U.S. forces and military installations from Taiwan" but did not commit to any specific timeframe.[16]

Likewise, in the December 15, 1979, and August 17, 1982, Joint Communiqués, the United States acknowledged the Chinese position regarding the status of Taiwan but did not agree.[17]  "Within that context, the two sides agreed that the people of the United States would continue to maintain cultural, commercial, and other unofficial relations with the people of Taiwan" as opposed to official, diplomatic relations with Taiwan as a sovereign state.[18]

Neither the Executive Order No. 13014 of August 15, 1996, nor its predecessor, the Executive Order No. 12143 of June 22, 1979, affected the status of Taiwan.  Defendant concedes that these Orders "spelled out the manner in which the United States is to maintain unofficial relations with the people of Taiwan" as opposed to official, diplomatic relations with Taiwan as a sovereign state.  (Memo. Def.'s Mot. to Dismiss at 4.)

## ARGUMENT

## I.   THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THE ACTION.

This Court has subject matter jurisdiction over the action.  The case does not present a nonjusticiable political question, but rather requires interpretation of treaties, statutes, and the United States Constitution using regular means of interpretation.  This Court's subject matter jurisdiction is specifically authorized by statutes.

---

[15]     Joint Communiqué, 66 Dep't St. Bull. 436 (1972).

[16]     Joint Communiqué, 66 Dep't St. Bull. 438 (1972).

[17]     Joint Communiqué, 79 Dep't St. Bull. 25 (1979); Joint Communiqué, 18 Weekly Comp. Pres. Docs. 1039 (1982).

[18]     Joint Communiqué, 18 Weekly Comp. Pres. Docs. 1039 (1982).

**A. This Case Does Not Present a Non-Justiciable Political Question.**

The question presented in this case is simply whether the United States Constitution and laws guarantee any rights to Plaintiffs. The question presented in this case requires interpretation of treaties, statutes, and the Constitution using regular means of interpretation. Adjudicating this question does not require the court to contradict any policy determination already made by the political branches or interfere with their conduct of foreign relations.

1. The *Baker/Goldwater* standard for determining whether a case presents a nonjusticiable political question.

The political question doctrine is a narrow doctrine that restrains the courts from deciding "political questions," not "political cases." *Baker v. Carr*, 369 U.S. 186, 217, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962) (emphasis added); *see also Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 796-798, 233 U.S. App. D.C. 384 (1984) ("Nonjusticiability based upon "political question" is *at best a limited* doctrine . . . . It is . . . clear that the political question doctrine is a very limited basis for nonjusticiability.")(emphasis in the original).

The modern standard for determining whether a case presents a nonjusticiable political question is set forth in *Baker v. Carr*:

> Prominent on the surface of any case held to involve a political question is found
> [(1)] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or
> [(2)] a lack of judicially discoverable and manageable standards for resolving it; or
> [(3)] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or
> [(4)] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or
> [(5)] an unusual need for unquestioning adherence to a political decision already made; or
> [(6)] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217.

In *Goldwater v. Carter*, 444 U.S. 996, 998, 100 S. Ct. 533, 62 L. Ed. 2d 428 (1979) involving justiciability of President's termination of the Mutual Defense Treaty with Taiwan, Justice Powell distilled the *Baker* test into three inquiries:

> (i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of Government? [covering the first *Baker* factor]
> (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? [covering the second and third *Baker* factors]
> (iii) Do prudential considerations counsel against judicial intervention? [covering the fourth, fifth, and sixth *Baker* factors]

*Id.* at 998 (Powell, J., concurring); *see also Wang v. Masaitis*, 416 F.3d 992, 995 (9th Cir. 2005) (applying the analysis discussed by Justice Powell in *Goldwater*). Defendant has failed to establish that any of the *Baker/Goldwater* factors bar judicial resolution of the particular question presented by Plaintiffs.

2. <u>Not all cases involving foreign relations present "political questions."</u>

With respect to the cases involving foreign relations, the Supreme Court cautioned in *Baker* that "<u>it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance</u>." *Id.* at 211 (emphasis added). Rather then declining to exercise jurisdiction purely because a case involves foreign relations, the courts must engage in "a discriminating analysis of the particular question posed[.]" *Id.*

Applying *Baker* in a case involving foreign relations, the D.C. Circuit noted,

> While the Constitution grants to the political branches, and in particular to the Executive, responsibility for conducting the nation's foreign affairs, <u>it does not follow that the judicial power is excluded from the resolution of cases merely because they may touch upon such affairs</u>. The court must instead look at "the particular question posed" in the case. *Baker v. Carr*, 369 U.S. at 211. In fact, <u>courts are routinely deciding cases that touch upon or even have a substantial impact on foreign and defense policy</u>.

*Dellums v. Bush,* 752 F. Supp. 1141, 1146 (D.C. Cir. 1990) (emphasis added).

Similarly, applying *Baker* in a case touching foreign relations, the Second Circuit opined,

> Not every case "touching foreign relations" is nonjusticiable, . . . and judges should not reflexively invoke these doctrines to avoid difficult and somewhat sensitive decisions in the context of human rights . . . . <u>Although these cases present issues that arise in a politically charged context, it does not transform them into cases involving nonjusticiable political questions.</u>  The doctrine is one of <u>"political questions," not one of "political cases."</u>

*Kadic v. Karadzic,* 70 F.3d 232, 249 (2d Cir. 1995) (emphasis added) (internal citations and quotations omitted).

The courts have consistently rejected the political question challenge in the cases requiring treaty, statutory, or constitutional interpretation, even though such cases involved foreign relations. *See, e.g., Wang v. Masaitis,* 416 F.3d 992 (9th Cir. 2005) (holding that the political question doctrine did not preclude the court from considering the constitutionality of the extradition treaty with Hong Kong, a non-sovereign, under the Treaty Clause of the Constitution); *Ungar v. Palestine Liberation Organization,* 402 F.3d 274 (1st Cir. 2005) (holding that the political question doctrine did not preclude resolution of the question whether the Palestine Liberation Organization was a sovereign state immune from suit under the Anti-Terrorist Act and the Foreign Sovereign Immunities Act); *Rasul v. Bush,* 542 U.S. 466, 124 S. Ct. 2686, 159 L. Ed. 2d 548 (2004) (overcoming the political question challenge and holding that foreign detainees held at the Guantanamo Bay Naval Base in Cuba could challenge the legality of their indefinite detention under the United States laws in federal courts); *In re Agent Orange Prod. Liab. Litig.,* 373 F. Supp. 2d 7 (E.D.N.Y. 2005) (holding justiciable the Vietnamese plaintiffs' claims against American chemical companies for exposure to herbicides used during the Vietnam War under international conventions and domestic statutes); *Kadic v. Karadzic,* 70 F.3d 232, 249 (2d Cir. 1995) (holding justiciable the plaintiff's claims against President of

Bosnian-Serb Republic Karadzic for genocide, war crimes, and crimes against humanity under international conventions and domestic statutes); *Japan Whaling Ass'n v. American Cetacean Soc'y,* 478 U.S. 221, 92 L. Ed. 2d 166, 106 S. Ct. 2860 (1986) (rejecting the political question challenge and adjudicating on the merits the plaintiffs' claim against the Secretary of Commerce for failure to certify Japan as an international whaling quota violator pursuant to a statute, even though the United States and Japan concluded an international executive agreement whereby Japan promised to cease its whaling by 1988, and the Secretary of Commerce promised not to certify Japan.); *Hamdi v. Rumsfeld*, 542 U.S. 507, 124 S. Ct. 2633, 159 L. Ed. 2d 578 (2004) (overcoming the political question challenge and deciding what process is due to a Guantanamo Bay detainee held as an "enemy combatant" pursuant to a statute); *Dellums v. Bush*, 752 F. Supp. 1141 (D.D.C. 1990) (rejecting the political question challenge and holding that the United States' offensive military operations in Iraq rose to the level of "war" requiring a Congressional declaration of war pursuant to the Constitution); *United States v. Shiroma*, 123 F. Supp. 145 (D. Haw. 1954) (deciding the issue whether the United States acquired *de jure* sovereignty over Okinawa, Ryukyu Islands, under the San Francisco Peace Treaty, and whether Okinawans owed permanent allegiance to the United States); *Cheng Fu Sheng v. Rogers*, 177 F. Supp. 281 (D.D.C. 1959) (deciding the issue whether Taiwan is a "country" for the purpose of the deportation statute, and whether Taiwan is part of China), *rev'd on other grounds*, *Rogers v. Cheng Fu Sheng*, 108 U.S. App. D.C. 115, 280 F.2d 663 (D.C. Cir. 1960) (reversed on the grounds that the deportation statute contemplates a broader meaning of the word "country" than "national sovereignties" to reduce the number of "undeportables").

3. <u>There is no "textually demonstrable" "commitment" of the question presented by Plaintiffs to the political branches.</u>

With regard to the first *Baker* factor, there is a textually demonstrable commitment of the question presented by Plaintiffs to the judiciary as opposed to any coordinate political department. The Constitution explicitly extends judicial power to the interpretation of treaties and statutes. U.S. CONST. art. III, §2 ("The Judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority").

The Supreme Court reiterated that "the courts have the authority to construe treaties and executive agreements, and it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts." *Japan Whaling Ass'n v. American Catecean Soc'y*, 478 U.S. 221, 230, 106 S. Ct. 2860, 92 L. Ed. 2d 166 (1986). Lower courts added that the "[c]ourts remain obliged to determine whether [statutory and treaty] provisions may be interpreted as guarantees of enforceable rights." *In re Agent Orange Prod. Liab. Litig*, 373 F. Supp. 2d 7, 69 (E.D.N.Y. 2005). The courts have a Constitutional duty to interpret statutes and treaties, considering that "under the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones." *Id.* at 69. Lower courts adopted the view that "[t]reaties are the law of the land. Cases arising under treaties are justiciable. Louis Henkin, *Lexical Priority or 'Political Question': A Response*, 101 HARV. L. REV. 524, 531 (1987)." *Id.* at 75.

To the extent Defendant argues that the political question doctrine bars this Court from interpreting the SFPT, the TRA, the INA, the APA, and the Constitution to ascertain Plaintiff's rights, Defendant's position is contrary to judicial precedents. Judicial precedents show that this Court has the constitutional power and duty to interpret the SFPT, the TRA, the INA, the APA,

and the Constitution to determine whether their provisions guarantee enforceable rights to Plaintiffs.[19]

> 4. There is no "lack of judicially discoverable and manageable standards" or "impossibility of deciding without an initial policy determination."

Concerning the second and third *Baker* factors, there is no "lack of judicially discoverable and manageable standards" or "impossibility of deciding without an initial policy determination." In deciding this case, this Court would use "regular means of [treaty, statutory, and] constitutional interpretation" to ascertain Plaintiffs' rights under the SFPT, the TRA, the INA, the APA, and the Constitution.[20] *See Wang v. Masaitis*, 416 F.3d 992, 996 (9th Cir. 2005)

---

[19]    Contrary to Defendant's misreading of *Hwang Geum Joo v. Japan*, 413 F.3d 45, 367 U.S. App. D.C. 45 (D.C. Cir. 2005), *Joo* does not bar this Court from considering the Treaty of Taipei between the ROC and Japan for the limited purpose of ascertaining which country exercised sovereignty over Taiwan following the Pacific War. United States courts routinely interpret international agreements to which the United States is not a party, concerning events outside the United States, to examine the status of a territory or entity and to determine whether a United States statute applied to it. *See, e.g., Cheng Fu Sheng v. Rogers*, 177 F. Supp. 281 (D.D.C. 1959) (interpreting, *inter alia*, the Treaty of Shimonoseki between China and Japan to ascertain the status of Taiwan and to determine whether the United States deportation statute applied to it); *Ungar v. Palestine Liberation Organization*, 402 F.3d 274 (1st Cir. 2005) (interpreting international agreements to which the United States was not a party to ascertain PLO's status and to determine whether the Anti-Terrorist Act and the Foreign Sovereign Immunity Act applied to it).

*Joo* is distinguishable so far as the plaintiffs sought to enforce their rights under bilateral agreements to which the United States was not a party. In this case, by contrast, Plaintiffs are seeking a declaration of rights under United States laws and the Constitution.

[20]    Defendant takes the erroneous position that "it is unclear what 'judicially discoverable standards' this Court would use" to interpret General MacArthur's General Order No. 1. This Court would apply regular means of judicial interpretation to General MacArthur's General Order No. 1. *See, e.g., United States v. Voorhees*, 4 U.S.C.M.A. 509, 521 (1954) (setting forth a standard to interpret a general order or regulation "consistent with general law"); *Victorio v. United States*, 106 F. Supp. 182, 122 Ct. Cl. 708 (1952), *overruled on other grounds, Longronio v. United States*, 133. F. Supp. 395, 132 Ct. Cl. 596 (1955) (interpreting General MacArthur's General Orders Nos. 46 and 15 to ascertain whether the requisition of Victorio's cattle by Philippine guerrillas was on behalf of the United States Army).

("Resolution of the question may not be easy, but it only requires us to apply normal principles of interpretation to the constitutional provision at issue.") (internal citations and quotations omitted). Domestic and international law provides judicially discoverable and manageable standards for treaty, statutory and constitutional interpretation. *See Kadic* 70 F.3d at 249 ("universally recognized norms of international law provide judicially discoverable and manageable standards"); *Agent Orange*, 373 F. Supp. 2d at 70 ("While the answers to questions of international law, like those of domestic law, may not always be clear, they are ascertainable and manageable.").

This Court would not be deciding this case "without an initial policy determination" because such policy determination has already been made by the political branches. The policy determinations regarding Taiwan are reflected in the SFPT, the TRA, Executive Order No. 13014, Joint Communiqués, memoranda, and other documents.

5. <u>Judicial resolution of this case would not contradict any prior policy determination by the political branches and would not interfere with their conduct of foreign relations.</u>

With regard to the fourth through sixth *Baker* factors, which Justice Powell in *Goldwater* grouped as "prudential considerations," judicial resolution of this case does not require this Court to contradict any prior policy determination by the political branches regarding Taiwan or interfere with their conduct of foreign relations. *Kadic*, 70 F.3d at 249 (the "fourth through sixth *Baker* factors" are "relevant <u>only</u> if judicial resolution of a question would contradict prior

---

The Court would treat General MacArthur's Order No. 1 just as any other executive order as General MacArthur's authority was derived from the President of the United States. *Anglo Chinese Shipping Company, Ltd. v. United States*, 127 F. Supp. 553, 130 Ct. Cl. 361 (1955) (acknowledging that General MacArthur was an agent of the United States and each one of the Allied Powers); *Hirota v. MacArthur*, 338 U.S. 197, 69 S. Ct. 197, 93 L. Ed. 1902 (1948) (acknowledging "the chain of command from the United States Government to [General MacArthur,] the Supreme Commander" for the Allied Forces).

decisions taken by a political branch <u>in those limited contexts</u> where such contradiction would seriously interfere with important governmental interests" (emphasis added); *see also Ungar v. Palestine Liberation Organization*, 402 F.3d 274 (1st Cir. 2005).

Plaintiffs are *not* asking this Court to decide which country exercises *de facto* or *de jure* sovereignty over the territory of Taiwan (although at least one court has done it).[21] Plaintiffs are *not* asking the Court to decide the status of Taiwan (although Supreme Court's precedents would provide a basis for that.)[22] Instead, Plaintiffs are asking this Court to declare to what extent the

---

[21] If Plaintiffs asked this Court to decide which country exercises *de jure* sovereignty over Taiwan—which Plaintiffs are *not* asking this Court to do—*United States v. Shiroma*, 123 F. Supp. 145 (D. Haw. 1954) would supply a persuasive authority. In *Shiroma*, the Hawaii District decided the issue whether the United States exercised *de jure* sovereignty over Okinawa, the Ryukyu Islands, and whether Okinawans owed permanent allegiance to the United States and were United States nationals. *Id.* at 148. The court examined Article 3 of the SFPT dealing with the disposition of the Ryukyu Islands and a speech by John Foster Dulles, a consultant to the Secretary of State at the time. *Id.* at 148-149. The court held that Japan as opposed to the United States had *de jure* sovereignty over Okinawa following the SFPT, and therefore Okinawans were not United States nationals. *Id.* at 149. Interestingly, in reaching its conclusion, the Court specifically compared and contrasted the wording of Article 3 dealing with the disposition of the Ryukyu Islands, with the wording of Article 2 dealing with the disposition of Taiwan.

[22] If Plaintiffs asked this Court to decide the status of Taiwan—which Plaintiffs are *not* asking this Court to do— the "Insular Cases" summarized below would provide a basis. In the "Insular Cases," the Supreme Court interpreted the Treaty of Peace between the United States of America and the Kingdom of Spain, Dec. 10, 1898, U.S.-Spain, 30 Stat. 1754 (the "Treaty of Paris") (which concluded the Spanish War), ascertained the status of Puerto Rico and the Philippines, and defined the rights of persons living there. The "Insular Cases" would be relevant here because they involved judicial interpretation of a peace treaty disposing of a territory following the cessation of hostilities. In the "Insular Cases," Articles II and III of the Treaty of Paris provided for Spain ceding to the United States the island of Puerto Rico and the Philippine Islands. Similarly, in this case, Article 2(b) of the San Francisco Peace Treaty provided for Japan renouncing all right, title, and claim to Taiwan.

In *De Lima v. Bidwell,* 182 U.S. 1, 21 S. Ct. 743, 45 L. Ed. 1041 (1901), the Supreme Court interpreted the Treaty of Paris to ascertain the status of Puerto Rico to decide whether an importer of sugar cane in Puerto Rico was required to pay an import duty). Likewise, in *Downes v. Bidwell*, 182 U.S. 244, 21 S. Ct. 770, 45 L. Ed. 1088 (1901), the Supreme Court examined the status of Puerto Rico to determine whether an importer of oranges in Puerto Rico was required to pay an import duty. Similarly, in *Dorr v. United States*, the Supreme Court examined the status of the Philippines to determine whether a criminal defendant in the Philippines was entitled to a

United States Constitution and laws guarantee rights to Plaintiffs, based on pre-existing executive and legislative determinations considering Taiwan's status. By adjudicating the question presented by Plaintiffs, this Court would stay within the bound of judicial authority delineated in *Baker*:

> [T]he judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory, once sovereignty over an area is politically determined and declared, <u>courts may examine the resulting status and decide independently whether a statute applies to that area.</u>

*Baker*, 369 U.S. at 212.

This is precisely what the Ninth Circuit did in *Wang v. Masaitis*, 416 F.3d 992 (9th Cir. 2005). In *Wang*, the issue was whether the extradition treaty with Hong Kong was constitutional considering that Hong Kong was a non-sovereign. Just as in this case, in *Wang*, the United States argued that the constitutionality of the extradition treaty was a nonjusticiable political question because it arguably required the court to decide the status of Hong Kong. The Ninth Circuit disagreed and found that it "need not decide the status of Hong Kong's sovereignty." *Id.* at 994. "Rather, the constitutional issue that Wang has raised is whether the term 'treaty' in the Treaty Clause encompasses agreements with non-sovereigns, such as Hong-Kong -- and that question is clearly justiciable under *Baker v. Carr* . . . . " *Id.* Having considered the history of the transfer of sovereignty over Hong Kong from the United Kingdom to China in 1997, the legal instruments implementing the transfer, and the policy declarations regarding the transfer, the Ninth Circuit concluded that "<u>China's sovereignty over Hong Kong (and by corollary Hong Kong's subsovereign status) has been resolved by the executive branch, and we do not question</u>

---

jury trial under the Sixth Amendment of the Constitution. Also, in *Balzac v. Porto Rico*, 258 U.S. 298, 42 S. Ct. 343, 66 L. Ed. 627 (1922), the Supreme Court examined the status of Puerto Rico to determine whether a criminal defendant in Puerto Rico was entitled to a jury trial pursuant to Sixth Amendment of the Constitution.

that judgment." *Id*. at 995 (emphasis added). "However, this court may examine the resulting status of Hong Kong, and decide whether the Treaty Clause applies to Hong Kong as a constitutionally cognizable treaty party." *Id*. (emphasis added). Having overcome the political question hurdle, the Ninth Circuit upheld the extradition treaty with Hong Kong because Hong Kong's status was sufficient to satisfy the requirements of the Treaty Clause of the Constitution. *Id*. at 1000.

In light of *Wang*, this Court has the power to consider the history of the transfer of sovereignty over Taiwan from Japan under the SFPT, and the legislative and executive policy statements regarding Taiwan embodied in the TRA, Executive Order No. 13014, Joint Communiqués, memoranda, and other documents. Defendant cites multiple legislative and executive policy statements regarding Taiwan, which, according to Defendant, make "clear" what Taiwan's status is. (*See* Memo. Def's Mot. to Dismiss at 1.) Without questioning the judgment of the legislative and executive branches regarding Taiwan's status, this Court has the power to declare to what extent the United States Constitution and laws guarantee rights to Plaintiffs. Such declaration would not be incompatible with the position taken by the political branches regarding Taiwan. Such declaration would not interfere with the nation's ability to speak in one voice in the field of foreign relations, considering that Plaintiffs seek to vindicate their personal rights rather than influence America's foreign policy. *See Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929 (D.C. Cir. 1988) (finding the trial court's reliance on the political question doctrine misplaced so far as the plaintiffs sought to vindicate personal right rather than influence America's foreign policy).

According to *Cheng Fu Sheng v. Rogers*, 177 F. Supp. 281 (D.D.C. 1959), the courts may examine the status of a territory and decide whether a statute applies to it even if the status of the

territory is still in limbo. In *Cheng Fu Sheng*, the court decided the issue whether Taiwan is a "country" for the purpose of the deportation statute, and whether Taiwan is a part of China. *Cheng Fu Sheng*, 177 F. Supp. at 282. To decide the case without interfering with the conduct of foreign relations, the court felt it was "necessary" "to ascertain and be guided by the attitude of the Department of State on the question whether [Taiwan] is to be regarded as a part of China." *Id.* at 283. To that end, the court examined, *inter alia*, a Department of State Bulletin, which constituted an official expression of foreign policy regarding Taiwan. The Bulletin discussed the Treaty of Shimonoseki, whereby China ceded Taiwan to Japan; the Cairo Declaration; the Potsdam Declaration; the 1945 Instrument of Surrender; General MacArthur's General Order No. 1; and the SFPT, whereby Japan renounced all "right, title and claim" to Taiwan. *Id.* at 283-284, citing Dep't State Bulletin, Vol. XXXIX, No. 1017, Dec. 22, 1958, at 1005-1009. The Department of State Bulletin further stated that "[n]either [the SFPT] nor any other agreement thereafter has purported to transfer the sovereignty of [Taiwan] to China." *Id.* (emphasis added). The court held "that the sovereignty of [Taiwan] has not been transferred to China; and that [Taiwan] is not a part of China as a country, at least not as yet, and not until and unless appropriate treaties are hereafter entered into." *Id.* at 284 (emphasis added). Accordingly, the court held that under the deportation statute, the plaintiffs deportable to China could not be deported to Taiwan because Taiwan was not a part of China, and Taiwan was not a "country."

The D.C. Circuit reversed on the ground which had nothing to do with the court's power to examine the status of Taiwan for the purpose of the deportation statute, leaving this part of the holding intact. *Rogers v. Cheng Fu Sheng*, 280 F.2d 663, 108 U.S. App. D.C. 115 (D.C. Cir. 1960). The D.C. Circuit reversed on the ground that the word "country" as used in the deportation statute had a broader meaning than "national sovereignties," considering that the

purpose of the statute was "to reduce the number of 'undeportables' by increasing the number of places to which an alien under a final order of deportation may be sent." *Rogers*, 280 F.2d at 665. Interestingly, the D.C. Circuit implicitly acknowledged that "[Taiwan] is neither a country itself nor part of any country, its status being in limbo[,]" but it did not restrain the court from adjudicating the case. *Id.* at 664. Thus, prudential considerations do not restrain this Court from adjudicating the question presented by Plaintiffs.

This approach is also consistent with *Vermilya-Brown Co. v. Connell*, 355 U.S. 377, 69 S. Ct. 140, 93 L. Ed. 76 (1948), which Defendant quotes (in part) on page 9 of its Memorandum. (Memo. Def.'s Mot. to Dismiss at 9.)    In *Vermilya-Brown*, the Supreme Court opined, "[r]ecognizing that the determination of sovereignty over an area is for the legislative and executive departments . . . *does not* debar courts from examining the status resulting from prior action." *Vermilya-Brown*, at 380 (emphasis added). In *Vermilya-Brown*, the Supreme Court adhered to the Department of State's view that Great Britain, by leasing Bermuda to the United States, did not "transfer sovereignty over the leased areas . . . to the United States." *Id.* Nonetheless, the Supreme Court held that Congress intended for the Fair Labor Standards Act to apply to the United States military base in Bermuda. *Id.* at 390.

Furthermore, declining to exercise jurisdiction on prudential grounds would be inconsistent with *Ungar v. Palestine Liberation Organization*, 402 F.3d 274 (1st Cir. 2005), where the First Circuit examined the Palestinian Liberation Organization ("PLO")'s non-statehood status.[23] It would also be contrary to *Rasul v. Bush*, 542 U.S. 466, 124 S. Ct. 2686,

---

[23]    In *Ungar*, the question was whether the PLO, a governmental entity, was a sovereign state immune from suit under the Anti-Terrorist Act and the Foreign Sovereign Immunities Act. *Ungar*, 402 F.3d at 279. The defendant PLO argued that the First Circuit was precluded from adjudicating the case because it presented a nonjusticiable political question. The First Circuit found "this argument unconvincing," found that the plaintiffs "easily clear the six Baker

159 L. Ed. 2d 548 (2004), where the Court examined the United States' sovereignty over the Guantanamo Bay Naval Base in Cuba.[24]

On a final note, just as in *Ungar*, in this case, Defendant's "unhappiness" about this case "is understandable, but legally irrelevant." *Ungar*, 402 F.3d at 281. Although this case, just as *Ungar*, may "engender strong feelings," its "capacity to stir emotions is not enough to render an issue nonjusticiable." *Id.*

---

hurdles," and turned to the merits of the case. *Id.* at 279-280. The First Circuit then considered the historical background: the United Kingdom's mandate over Palestine following World War I; the United Nation's plan to create two independent states (one Jewish, the other Arab) within the mandate territory; the withdrawal of the British; the ensuing Arab-Israeli conflicts; the United Nations' resolutions concerning Palestine's self-determination and sovereignty, and granting the PLO observer status at the United Nations; the PLO's declaration of independence of Palestine in 1988; the 1994 agreement between Israel and PLO; and the United Nations' enhancement of the PLO's observer status. *Id.* at 284-289. Applying the international law definitions of statehood codified in the Restatement (Third) of Foreign Relations and the Montevideo Convention of 1933, the First Circuit held that the PLO failed to meet the burden of demonstrating "statehood" and was not entitled to foreign sovereign immunity. *Id.* at 292, 294.

[24] In *Rasul*, the Supreme Court addressed the issue whether federal courts have jurisdiction to consider the legality of detention of foreign detainees held at the Guantanamo Bay Naval Base in Cuba. In *Rasul*, Australian and Kuwaiti detainees held at the Guantanamo Bay Naval Base filed habeas corpus petitions with this Court, challenging the legality of their indefinite detention under the United States laws. This Court dismissed all the petitions for want of jurisdiction on the grounds that the aliens were detained outside of the sovereign territory of the United States. The D.C. Circuit affirmed. The Supreme Court reversed. In deciding the case, the Supreme Court considered the history of the Guantanamo Bay's possession by the United States and examined the 1903 Lease Agreement with Cuba, which provided that the United States exercised "complete jurisdiction and control" over the Guantanamo Base Naval Base, although Cuba retained "ultimate sovereignty" over it. *Id.* at 480, 487, *see also* Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, Art. III, T.S. No. 418. The Supreme Court held that federal courts had jurisdiction to consider challenges to the legality of the detention of foreign detainees held at the Guantanamo Bay Naval Base. *Id.* at 483.

Justice Kennedy emphasized in his concurring opinion that the reason *why* federal courts had jurisdiction was grounded in the "status of Guantanamo Bay." *Id.* at 488. Justice Kennedy reasoned, "Guantanamo Bay is in every practical respect a United States Territory[.]" *Id.* at 487. Further, "[f]rom a practical perspective, the indefinite lease of Guantanamo Bay has produced a place that belongs to the United States, extending the "implied protection" of the United States to it." *Id.*

### B.  This Court Has Jurisdiction Authorized by Statutes.

Consistent with Article III, §2 of the United States Constitution, this Court's jurisdiction is authorized by the following statutes: 28 U.S.C. § 1331; the INA § 360, 8 U.S.C. § 1503, with respect to the action brought by individual Plaintiffs; and the APA §§ 702 and 704.

This Court has Federal Question jurisdiction of "all civil actions arising under the Constitution, laws, or treaties of the United States" pursuant to 28 U.S.C. § 1331.

This action arises under the INA so far as it involves the Court's determination of the individual Plaintiffs' nationality status under the INA § 360, 8 U.S.C. § 1503.  This statutory provision authorizes the Court's jurisdiction over declaratory judgment actions for declaration of United States nationality.

This action also arises under the APA so far as it involves the Court's review of an agency action pursuant to 5 U.S.C. §§ 702 and 704.  This statutory provision authorizes the Court's jurisdiction to review "agency action," which resulted in a "legal wrong" or "adversely affected or aggrieved" a "person."

This action also arises under the SFPT so far as it requires the Court to decide which benefits it confers upon Plaintiffs.

Finally, this action arises under the Constitution of the United States because it involves this Court's declaration of Plaintiffs' constitutional rights as United States nationals.

## II.  PLAINTIFFS STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

In the Amended Complaint, Plaintiffs stated a claim upon which relief can be granted. Plaintiffs' cause of action is based on the INA § 360, 8 U.S.C. § 1503; the APA § 702; the SFPT; and the United States Constitution.

In its April 5, 2007, Motion to Dismiss, Defendant only moved to dismiss Plaintiffs' claim based on the INA § 360, 8 U.S.C. § 1503, and did not challenge the bases for Plaintiffs' other claims. (Memo. Def.'s Mot. to Dismiss at 12-14.)

According to the INA § 360, 8 U.S.C. § 1503, "any person" who is "denied" a "right or privilege as a national of the United States" "by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States," has a cause of action for declaration of nationality. As demonstrated below, Plaintiffs stated a claim for declaration of nationality.

### A. Plaintiffs Are United States Nationals Because They Owe Permanent Allegiance to the United States.

Defendant circularly contends that the individual Plaintiffs' claim for declaration of nationality should be dismissed because they are not United States nationals. (Memo. Def.'s Mot. to Dismiss at 3). INA § 101(a)(22)(B), 8 U.S.C. § 1101(a)(22)(B) defines a "national of the United States" as "a person who, though not a citizen of the United States, owes permanent allegiance to the United States." Individual Plaintiffs satisfy this definition because they owe permanent allegiance to the United States, having been born in a territory subject to *de jure* sovereignty of the United States.

The courts made clear that a person born in a territory subject to *de jure* sovereignty of the United States owes permanent allegiance to the United States, and can therefore be regarded as a United States national. *See, e.g., United States v. Shiroma*, 123 F. Supp. 145 (D. Haw. 1954) (holding that Japan as opposed to the United States exercised *de jure* sovereignty over Okinawa pursuant to the SFPT, and therefore an Okinawan did not owe permanent allegiance to the United States and was not a United States national). It is well-established that a person can attain United States nationality by birth in a territory subject to *de jure* sovereignty of the United

States. *See Rabang v. Boyd*, 353 U.S. 427, 77 S. Ct. 985, 1 L. Ed. 2d 956 (1957) (acknowledging that persons born in the Philippine Islands after 1899 were nationals of the United States and owed permanent allegiance to it; holding that a Philippino lost his United States nationality when the United States relinquished its sovereignty over the Philippine Islands in 1946, which severed his permanent allegiance to the United States).

In this case, the individual Plaintiffs were born in Taiwan, a territory subject to *de jure* sovereignty of the United States pursuant to the SFPT.    Therefore, they owe permanent allegiance to the United States and can be regarded as United States nationals.    Contrary to Defendant's mischaracterization of the action, Plaintiffs' "entire basis for asking this Court to declare that they are nationals of the United States" is not the "mere fact" "that they reside in Taiwan." (Memo. Def.'s Mot. to Dismiss at 12.)

Defendant argues that a manifestation of permanent allegiance to the United States is not enough to attain United States nationality.    In support of this argument, Defendant cites *Marquez-Almanzar v. INS*, 418 F.3d 210 (2nd Cir. 2005).  This Second Circuit case, however, is not controlling and is distinguishable.  In the Second Circuit case, a Dominican argued, *inter alia*, that he became a United States national when he enrolled in the United States Army, which required him to swear allegiance to the United States Constitution.  *Marquez-Almanzar*, at 216. The Second Circuit rejected his argument and held that "one cannot qualify as a U.S. national under 8 U.S.C. § 1101(a)(22)(B) by a manifestation of 'permanent allegiance' to the United States." *Id.* at 218-219.

The holding in *Marquez-Almanzar* is inapplicable here.  In this case, unlike *Marquez-Almanzar*, Plaintiffs' nationality claim is not based on any action manifesting permanent allegiance to the United States.  Instead, the individual Plaintiffs' nationality claim is based on

birth in the territory subject to *de jure* sovereignty of the United States. Even in *Marquez-Almanzar*, the Second Circuit acknowledged that certain persons can be regarded as United States nationals and owe permanent allegiance to the United States by virtue of birth in the territory subject to the sovereignty of the United States and "pending the final and complete withdrawal of the sovereignty of the United States." *Id.* at 218.

### B. The INA § 308, 8 U.S.C. § 1408 Does Not Provide an Exhaustive List of Ways To Acquire United States Nationality.

The INA § 308, 8 U.S.C. § 1408 lists four categories of persons born, found or present in the "outlying possessions" of the United States, who "shall be nationals, but not citizens, of the United States at birth." This provision, however, does not state or imply that no other categories of persons can be regarded as nationals of the United States. Other categories of persons can owe permanent allegiance to the United States within the meaning of INA § 101(a)(22)(B), 8 U.S.C. § 1101(a)(22)(B).

Defendant seeks to mislead the Court into believing that in order to adjudicate Plaintiffs' nationality status, the Court must apply the INA § 308, 8 U.S.C. § 1408. Numerous courts adjudicated the plaintiffs' nationality claims based on birth without applying the INA § 308, 8 U.S.C. § 1408, or the concept of the "outlying possessions." *See, e.g., Rabang v. Boyd*, 353 U.S. 427, 77 S. Ct. 985, 1 L. Ed. 2d 956 (1957); *Valmonte v. INS*, 136 F.3d 914 (2nd Cir. 1998); *Oliver v. DOJ and INS*, 517 F.2d 426 (2nd Cir. 1975); *Cabebe v. Acheson*, 183 F.2d 795 (9th Cir. 1950). There is no Supreme Court or the Court of Appeals for the District of Columbia Circuit precedent binding this Court to apply 8 U.S.C. § 1408. At best, "the circuits are split on whether 'national' status is limited to [the persons referred to in 8 U.S.C. § 1408]; certainly [8 U.S.C.] § 1101(a)(22) permits a broader interpretation." *Shittu v. Elwood*, 204 F. Supp. 2d 876, 879 (E. D. Pa. 2002).

### C. The INA Does Not Provide an Exhaustive List of Territories Subject to *De Jure* Sovereignty of the United States.

Defendant argues that Plaintiffs do not meet the criteria set forth in 8 U.S.C. § 1408, essentially because Taiwan is not listed as an "outlying possession" of the United States in the INA § 101(a)(29), 8 U.S.C. § 1101(a)(29). The INA § 101(a)(29), 8 U.S.C. § 1101(a)(29) defines the "outlying possessions of the United States" as "American Samoa and Swains Island."

In view of the United States Department of State, however, the INA's definition of the "outlying possessions" does not cover all the territories subject to *de jure* sovereignty of the United States. According to the Department of State's Foreign Affairs Manual, section on "Status of Inhabitants of Territories Not Mentioned in the Immigration and Nationality Act,"

> "[t]he United States exercises sovereignty over a few territories besides those mentioned [in the INA]. Under international law and Supreme Court dicta, inhabitants of those territories, (Midway, Wake, Johnson, and other islands) would be considered non-citizen, U.S. nationals; However, because the INA defines "outlying possessions of the United States" as only American Samoa and Swains Island, there is no current law relating to the nationality of the inhabitants of those territories or persons born there who have not acquired U.S. nationality by other means.

7 FAM 1121.4-3, *available at* http://foia.state.gov/masterdocs/07fam/07m1120.pdf (emphasis added).

Defendant cites a footnote in the dissenting opinion in *Miller v. Albright*, 523 U.S. 420, 118 S. Ct. 1428, 140 L. Ed. 2d 575 (1998), for the proposition that "the only remaining noncitizen nationals are residents of American Samoa and Swains Island." *Miller*, at 467. The view expressed in the dissenting opinion in this factually distinct case, however, has no application to this case.[25]

---

[25] All other cases that adopt this view, including *Abur v. Republic of Sudan*, 437 F. Supp. 2d 166 (D.D.C. 2006) cited by Defendant on page 14 of its Memorandum, are factually distinct and do not bind this court. (Memo. Def.'s Mot. to Dismiss at 14.) In all of these cases, the plaintiffs failed to show United States nationality based on long-term residence in the United States,

Other courts have also indicated that persons other than the natives of the American Samoa and Swains Island can qualify as United States nationals. *See United States v. Morin*, 80 F.3d 124 (4th Cir. 1996); *Hughes v. Ashcroft*, 255 F.3d 752 (9th Cir. 2001); *Shittu v. Elwood*, 204 F. Supp. 2d 876 (E.D. Pa. 2002).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion to Dismiss.

Respectfully submitted,

Charles H. Camp (D.C. Bar # 413575)
LAW OFFICES OF CHARLES H. CAMP
1725 Eye Street, N.W., Suite 300
Washington, D.C. 20006
Telephone: (202) 349-3905
Facsimile: (202) 349-3906
Email: ccamp@charlescamplaw.com

**Counsel for Plaintiffs**

April 19, 2007

---

application for naturalization, and other acts manifesting "permanent allegiance" to the United States. In this case, by contrast, Plaintiffs seek a declaration of United States nationality based on birth in the territory subject to *de jure* sovereignty of the United States.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing paper was served upon the following counsel for Defendant electronically via the Court's Electronic Case Filing system this 19th day of April 2007:

Adam D. Kirschner, Esquire
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044

Charles H. Camp

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DR. ROGER C. S. LIN, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNITED STATES OF AMERICA, )<br><br>Defendant. ) | Civil Action No. 06-1825 (RMC) |

### ORDER DENYING DEFENDANT'S MOTION TO DISMISS

THIS CAUSE came before the Court on Defendant's Motion to Dismiss (the "Motion").

The Court having reviewed said Motion and considered all arguments of the parties, it is hereby:

ORDERED AND ADJUDGED that the Motion is denied.

**DONE and ORDERED this ___ day of _____ 2007.**


_____
Honorable Rosemary M. Collyer
United States District Judge