UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DR. ROGER C.S. LIN, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 06-1825 (RMC) |
| UNITED STATES OF AMERICA, | ) ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM OPINION**

In this case, the Plaintiffs, residents of Taiwan and the Taiwan Nation Party, ask the Court to interpret treaties, statutes, and other legislative and executive pronouncements to determine to what extent the Immigration and Nationality Act ("INA"),[1] the Administrative Procedure Act ("APA"),[2] and the United States Constitution apply to them. The United States moves to dismiss, arguing that the suit presents a non-justiciable political question and that the Court lacks subject matter jurisdiction. *See* Def.'s Mot. to Dismiss ("Def.'s Mem.") [Dkt. #17].

**I. BACKGROUND FACTS**

A short history lesson is provided by the Complaint. *See* Am. Compl. [Dkt. #16]. In 1894, Japan and China engaged in the Sino-Japanese War in which Japan defeated China. Am. Compl. ¶ 26. Both governments signed the Treaty of Shimonoseki on April 17, 1895. *Id*. ¶ 27. Pursuant to the Treaty, China ceded Taiwan (then known as Formosa) to Japan in perpetuity and full

---

[1] 8 U.S.C. §§ 1101-1777 (2007).

[2] 5 U.S.C. §§ 701-706 (2007).

sovereignty. *Id*. ¶ 28.

On December 7, 1941, Japan attacked the United States naval base at Pearl Harbor, Hawaii, and as a result the United States Congress issued a Declaration of War on December 8. *Id*. ¶¶ 29-30. After an intense war, Japan surrendered on September 2, 1945. Japanese representatives signed the Instrument of Surrender aboard the battleship USS Missouri, anchored in Tokyo Bay. *Id*. ¶ 31. On that same day, General Douglas MacArthur, Supreme Commander for the Allied Powers,[3] issued General Order No. 1, ordering the "senior Japanese commanders and all ground, sea, air and auxiliary forces within . . . Formosa" to "surrender to Generalissimo Chiang Kai-shek." *Id*. ¶ 32; *see also* Supreme Commander for the Allied Powers General Order No. 1, Sept. 2, 1945, J.C.S. 1467/2. According to the Complaint, "[p]ursuant to the General Order No. 1, Chiang Kai-shek, a military and political leader of the [Republic of China ("ROC")], was a 'representative of the Allied Powers empowered to accept surrender[]'" of the Japanese forces. Am Compl. ¶ 32. On October 25, 1945, Chiang Kai-shek's representative in Taiwan accepted the surrender of the Japanese forces there, although "[t]he surrender and repatriation of the Japanese forces in Taiwan (Formosa) was carried out with substantial assistance of the United States armed forces." *Id*. ¶¶ 33-34.

On September 8, 1951, the Allied Powers and Japan signed the San Francisco Peace Treaty ("SFPT"), which entered into force on April 28, 1952. *Id*. ¶ 37. Article 2(b) of the SFPT provided, "Japan renounces all right, title and claim to Formosa and the Pescadores." *Id*. ¶ 38; *see also* Treaty of Peace with Japan, art. 2(b), Sept. 8, 1951, 136 U.N.T.S. 46 (entered into force Apr.

---

[3] The Allied Powers included Australia, Canada, Ceylon, France, Indonesia, the Kingdom of the Netherlands, New Zealand, Pakistan, the Republic of the Philippines, the United Kingdom of Great Britain and Northern Ireland, and the United States of America. *See* Am. Compl. ¶ 40.

28, 1952).  However, the SFPT did not indicate to whom sovereignty over Taiwan was to be transferred.  *See* Am. Compl. ¶ 39.  The Complaint alleges that "[n]either the ROC government, which occupied the island of Taiwan (Formosa) as agent for the 'principal occupying Power,'[4] nor the government of the Peoples' Republic of China ("PRC"), which controlled mainland China, signed, ratified, or adhered to the SFPT." *Id*. ¶ 41.  "The parties to the SFPT chose not to give "any right, title [or] claim to Formosa and the Pescadores" to China.  *Id*. ¶ 44.

According to the Plaintiffs, the decision not to cede Formosa to China was a considered judgment.

> Prior drafts of Article 2(b) show that the Allied Powers originally intended to give China sovereignty over Taiwan (Formosa), but later affirmatively changed their intention.  The drafts dated August 5, 1947, and January 8, 1948, provided: "Japan hereby cedes to China in full sovereignty the island of Taiwan (Formosa) and adjacent minor islands[.]"  By contrast, the final draft of the SFPT did not transfer "full sovereignty" in Taiwan and the Pescadores Islands from Japan to China.

*Id*. ¶ 45.  Instead, Article 23 designated the United States as "the principal occupying Power," with the government of the ROC as its agent.  *Id*. ¶¶ 46-47.

A separate Treaty of Peace between the ROC and Japan, signed on April 28, 1952 and entered into force on August 5, 1952 (the "Treaty of Taipei"), also did not transfer sovereignty over Taiwan from Japan to China.  *Id*. ¶ 48.  It merely recognized that "Japan has renounced all right, title and claim to Taiwan (Formosa) and Penghu (the Pescadores)."  *Id*.; *see also* Treaty of Peace with Japan, Apr. 28, 1952, R.O.C.-Japan, 163 U.N.T.S. 38 (entered into force Aug. 5, 1952).

---

[4]  *See* SFPT, art. 23(a) ("the United States is 'the principal occupying Power'").  Am. Compl. at 9, n.20.

> In the aftermath of the SFPT, the governments of the leading allies interpreted the SFPT to mean that no state acquired sovereignty over Taiwan (Formosa) and title to its territory. For example, United States Secretary of State John Foster Dulles told the Senate in December 1954, "[the] [sic] technical sovereignty over Formosa and the Pescadores has never been settled. That is because the Japanese peace treaty merely involves a renunciation by Japan of its right and title to these islands. But the future title is not determined by the Japanese peace treaty, nor is it determined by the peace treaty which was concluded between the [ROC] and Japan." Likewise, British Foreign Secretary Anthony Eden told the British House of Commons, "under the Peace Treaty of April, 1952, Japan formally renounced all right, title and claim to Formosa and the Pescadores; but again this did not operate as a transfer to Chinese sovereignty, whether to the [PRC] or to the [ROC]. Formosa and the Pescadores are therefore, in the view of Her Majesty's Government, territory the de jure sovereignty over which is uncertain or undet[er]mined." Similarly, in 1964, President Georges Pompidou (then Premier of France) stated that "Formosa (Taiwan) was detached from Japan, but it was not attached to anyone" under the SFPT.

Am. Compl. ¶ 49. Further, the Complaint alleges that "[i]n 1955, United States Secretary of State John Foster Dulles confirmed that the basis for ROC's presence in Taiwan was that 'in 1945, the [ROC] was entrusted with authority over [Formosa and the Pescadores]' and 'General Chiang [Kai-shek] was merely asked to administer [Formosa and the Pescadores] for the Allied . . . [P]owers pending a final decision as to their ownership.'" *Id.* ¶ 50.

The Plaintiffs allege that this state of affairs has never changed: the United States remains the principal occupying Power, "holding sovereignty over Taiwan and title to its territory in trust for the benefit of the Taiwanese people," *id.* ¶ 56; the Taiwanese people have never declared their own sovereignty or formed their own government, *id.* ¶ 60; no one in the international community, including the United Nations and the United States, recognizes Taiwan as an

independent state, *id.* ¶¶ 61-63; under the Taiwan Relations Act ("TRA") of 1979, 22 U.S.C. §§ 3301-3316 (2006), "the people of the United States" maintain "commercial, cultural, and other relations" with the "people of Taiwan,"[5] because "the future of Taiwan" is still not "determined,"[6] *Id*. ¶¶ 59 & 64; in July 1982, the United States gave "Six Assurances" to Taiwan, including that it "would not formally recognize Chinese sovereignty over Taiwan," *id.* ¶ 65; and as late as October 25, 2004, United States Secretary of State Colin Powell confirmed that "Taiwan is not independent. It does not enjoy sovereignty as a nation, and that remains our policy, our firm policy." *Id.* ¶ 67.

Plaintiffs claim that they have rights and privileges as United States nationals including: fundamental rights under the U.S. Constitution, including a First Amendment right to petition for redress of grievances, a Fifth Amendment right to due process of law, an Eighth Amendment right against cruel and unusual punishment in the form of deprivation of a recognized nationality, and Fourteenth Amendment rights to due process and equal protection. *See id*. § VII.

## II.  LEGAL STANDARDS

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Because subject matter jurisdiction is an Article III as well as a statutory requirement, "no action of the parties can confer subject[]matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003). On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject matter jurisdiction. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999);

---

[5] TRA, 22 U.S.C. § 3301.

[6] *See supra* note 5.

*see also McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182-83 (1936).

Because subject matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003). Moreover, the court is not limited to the allegations contained in the complaint. *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Instead, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment]to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (internal citations omitted). The court must treat the complaint's factual allegations — including mixed questions of law and fact — as true, drawing all reasonable inferences in the plaintiff's favor. *Macharia,* 334 F.3d at 64, 67; *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003). The facts alleged "must be enough to raise a right to relief above the speculative level." *Twombly*, 127 S. Ct. at 1965. The court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. *Browning*, 292 F.3d at 242. In deciding a 12(b)(6) motion, the Court "may only consider the facts alleged in the

complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt, v. Chao*, 226 F. Supp. 2d at 196 (D.D.C. 2002) (citation omitted).

### III.  ANALYSIS

The basis for Plaintiffs' claims that they are nationals of the United States is that the United States is allegedly exercising sovereignty over Taiwan. *See* Am. Compl. ¶ 69 ("[c]onsidering that the United States is holding de jure sovereignty over Taiwan, the Taiwanese people owe permanent allegiance to the United States and have the status of United States nationals (as opposed to citizens)"). The Plaintiffs would have the Court address a quintessential political question and trespass into the extremely delicate relationship between and among the United States, Taiwan and China. This it is without jurisdiction to do.

The determination of who is sovereign over specific territory is non-justiciable. "Who is the sovereign, *de jure* or *de facto*, of a territory, is not a judicial, but a political, question, the determination of which by the legislative and executive of any government conclusively binds the judges, as well as all other officers, citizens, and subjects of that government. This principle has always been upheld by this court, and has been affirmed under a great variety of circumstances." *Jones v. United States*, 137 U.S. 202, 212 (1890) (citing cases as far back as 1818); *see also Boumediene v. Bush*, 476 F.3d 981, 992 (D.C. Cir. 2007), *cert. denied*, 127 S. Ct. 1478 (2007), *rehearing granted, order vacated*, 127 S. Ct. 3078 (2007) ("[t]he determination of sovereignty over an area, the Supreme Court has held, is for the legislative and executive departments") (internal citations omitted).

Neither *Ungar v. Palestine Liberation Org.*, 402 F.3d 274 (1st Cir. 2005) nor *Rasul*

*v. Bush*, 542 U.S. 466 (2004), on which Plaintiffs rely, grants the Court jurisdiction to determine whether the United States exercises sovereignty over Taiwan. *Ungar* involved statutory interpretation of the Antiterrorism Act which "neither signaled an official position on behalf of the United States with respect to the political recognition of Palestine nor amounted to the usurpation of a power committed to some other branch of government." *Ungar*, 402 F.3d at 260. Similarly, *Rasul* relied on "the express terms of [U.S.] agreements with Cuba," made by the Executive Branch, to define the scope of the U.S. relationship with Guantanamo Bay Naval Base. *Rasul*, 542 U.S. at 480-81. Plaintiffs ask the Court to interpret General Order No. 1, which was issued by General MacArthur as Supreme Commander of the Allied Powers—not by the Executive Branch of the United States Government. They acknowledge that the treaty actually negotiated and signed by the United States, the SFPT, only recognized that Japan had ceded sovereignty over Taiwan and did not address post-war sovereignty over Taiwan. "Interpreting" the SFPT, therefore, is of no assistance in this matter and the Court is without standards or boundaries to guide it in "interpreting" General Order No. 1.

In *Baker v. Carr*, 369 U.S. 186 (1962), the Supreme Court enumerated six factors that may render a case nonjusticiable under the Political Question doctrine: (1) textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment of multifarious pronouncements by various

departments on one question. *Baker*, 369 U.S. at 217; *see also Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005). "To find a political question, [the Court] need only conclude that one factor is present, not all." *Schneider*, 412 F.3d at 194. In the instant matter, at least four of the factors counsel against the exercise of jurisdiction over Plaintiffs' claims.

### A. Textually Committed to Coordinate Branches

Plaintiffs' suit raises policy questions that are textually committed to coordinate branches of government.

> As the Supreme Court suggested in *Marbury* [*v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803)] and made clear in later cases, "The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—'the political'—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision. *Oetjen* [*v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918)]. Otherwise put, "foreign policy decisions are the subject of just such a textual commitment," as contemplated in *Baker v. Carr*. *Comm. Of United States Citizens v. Reagan*, 859 F.2d 929, 933-34 (D.C. Cir. 1988).

*Schneider*, 412 F.3d at 412. Article I, Section 8 of the Constitution "is richly laden with delegation of foreign policy and national security powers" to the legislature. *Id.* "Article II likewise provides allocation of foreign relations and national security powers to the President, the unitary chief executive. . . . Indeed, the Supreme Court has described the President as possessing 'plenary and exclusive power' in the international arena and 'as the sole organ of the federal government in the field of international relations . . . .'" *Id.* at 413 (quoting *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936)).

As the sources cited by Plaintiffs make plain, at the end of World War II, the

sovereignty of Taiwan was an undecided question. It remains a very delicate issue in international relations. Plaintiffs want the Court to ignore intervening events[7] and catapult over the Executive and Legislative Branches, which have obviously and intentionally *not* recognized any power as sovereign over Taiwan. That inaction is as much committed by the Constitution to those "political" branches as their actions are. "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). Thus, the Court is without jurisdiction to adjudicate Plaintiffs' Complaint.

### B. Judicially Discoverable and Manageable Standards

The second criterion of the *Baker* six brings under the nonjusticiable umbrella of political question any case as to which there is "a lack of judicially discoverable and manageable standards for resolving it." 369 U.S. at 217. Plaintiffs argue that the Court need only perform a traditional judicial task: interpret treaties, laws and the Constitution. Certainly the Plaintiffs have identified a traditional judicial task but they misapprehend the nature of their own Amended Complaint. Fundamentally, they assert that General Order No. 1 made Chiang Kai-shek an agent for the principal occupying Power, *i.e.*, the United States, and that nothing since has withdrawn that agency or substituted any other Power over Taiwan. In order to examine the bases for Plaintiffs' claims, the Court would be required to interpret the *meaning* of General Order No. 1, the *authority* for the issuance of General Order No. 1, whether it had or has any *binding nature* on the Allies'

---

[7] *See, e.g.*, Executive Order No. 13014 of August 15, 1996, 61 Fed. Reg. 42963 (superseding Executive Order No. 12143 of June 22, 1979, 44 Fed. Reg. 37191), and the Taiwan Relations Act of 1979, 22 U.S.C. § 3301, *et seq*.

and/or the United States' foreign policy, and its *continued viability*.

Judges are not soldiers or diplomats. General Order No. 1 was entered very shortly after Japan signed the Instrument of Surrender and long before all Japanese soldiers actually laid down their arms. During the course of the 14-year Japanese invasion of China (1931-45), Chiang Kai-shek as head of the Kuomintang (KMT or "Chinese Nationalist People's Party") had continued to wage war against Mao Zedong, head of the Chinese Communist Party ("CCP"). China Page, U.S. Dept of State, http://www.state.gov/r/pa/ei/bgn/18902.htm (last visited Mar. 17, 2008) ("China Page"). It was not until 1949 that Chiang Kai-shek fled with the remnants of his KMT government and military to Taiwan, "where he proclaimed Taipei to be China's 'provisional capital' and vowed to re-conquer the Chinese mainland." *Id.* Thus, the purpose, language, and intentions behind General Order No. 1 might have been entirely blunted by later events. What is clear is that the judiciary is not equipped to interpret and apply, 50 years later, a wartime military order entered at a time of great confusion and undoubted chaos.

## C. Initial Policy Determination for Nonjudicial Discretion

Plaintiffs have essentially been persons without a state for almost 60 years. The last completely clear statement of authority over Taiwan came from General MacArthur in 1945. One can understand and sympathize with Plaintiffs' desire to regularize their position in the world.

That Plaintiffs remain in an international limbo is not, however, because they have been ignored by the United States or the rest of the world. The ascendency of Mao Zedong and the CCP dramatically changed the situation in the Taiwan Straits and created a long-standing tension between mainland China and the United States. "Any remaining hope of normalizing relations ended when U.S. and Chinese communist forces fought on opposing sides in the Korean conflict."

China Page at 17. Not until President Richard Nixon traveled to Beijing in February 1972 did the two nations pledge to work toward full normalization of diplomatic relations. *Id.* Finally,

> [i]n the Joint Communique on the Establishment of Diplomatic Relations dated January 1, 1979, the United States transferred diplomatic recognition from Taipei to Beijing. The United States reiterated the Shanghai Communique's acknowledgment of the Chinese position that there is only one China and that Taiwan is a part of China; Beijing acknowledged that the American people would continue to carry on commercial, cultural, and other unofficial contacts with the people of Taiwan.

*Id.* at 18. With passage of the Taiwan Relations Act, 22 U.S.C. § 3301, *et seq.*, and establishment of the American Institute of Taiwan, the United States has maintained unofficial relations with Taiwan.

In the face of these years and years of diplomatic negotiations and delicate agreements, it would be foolhardy for a judge to believe that she had the jurisdiction to make a policy choice on the sovereignty of Taiwan. The foreign relations of the United States are conducted by the President of the United States and the Executive and Legislative Branches will decide whether and under what circumstances the United States will recognize a sovereign government over Taiwan.

### D. Respect for Coordinate Branches of Government

This Court could not decide Plaintiffs' case without addressing the intentional and careful way in which the Executive Branch has *not* pressed forward on Taiwanese sovereignty, over these many years. Any effort on the part of the judiciary to declare Plaintiffs' rights under the U.S. Constitution, if any, would be impossible "without expressing a lack of respect due to [the Court's] coequal Branches of Government." *Schneider*, 412 F.3d at 198.

## IV. CONCLUSION

Finding that four of the six *Baker* factors apply here, the Court concludes that the Political Question Doctrine bars its consideration of Plaintiffs' Amended Complaint. The government's motion to dismiss will be granted. A memorializing order accompanies this Memorandum Opinion.

```
_____/s/_____
ROSEMARY M. COLLYER
United States District Judge
```

DATE: March 18, 2008